Samuel James LANKFORD and Corinthia Julia Lankford, his wife, Claude Tompkins and Rev. Elizabeth Tompkins, his wife, Walter Summers and Regina Summers, his wife, and Arthur Rayner

v.

Bernard J. SCHMIDT, as Commissioner of Police of Baltimore City.

Civ. No. 16080.

United States District Court
D. Maryland.
April 14, 1965.

· Juanita Jackson Mitchell, Tucker R. Dearing and W. A. C. Hughes, Jr., Baltimore, Md., James M. Nabrit, III, Melvin Zarr and Jack Greenberg, New York City, for plaintiffs.

Thomas B. Finan, Atty. Gen. of Maryland, Robert C. Murphy, Deputy Atty. Gen., and John W. Sause, Jr., Asst. Atty. Gen., Baltimore, Md., for defendant.

Robert E. Coughlan, Jr., H. Vernon Eney and William L. Marbury, Baltimore, Md., amici curiae.

THOMSEN, Chief Judge.

In this action brought under 28 U.S.C.A. § 1343 and 42 U.S.C.A. § 1983, plaintiffs seek an injunction restraining the Police Commissioner and the police officers of Baltimore City from continuing or resuming certain alleged practices which are claimed to be in violation of (A) the rights of plaintiffs and other residents of Baltimore under the Fourth Amendment, enforceable against the States through the Due Process Clause of the Fourteenth Amendment, and (B) the rights of plaintiffs and other Negro residents of Baltimore under the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs make the novel contention that police officers, having obtained a warrant for the arrest of X and Y, charged with armed robbery and/or murder, may not enter the dwelling of Z to search for and arrest X and Y without a search warrant, consent or exceptional circumstances, even though the officers have reasonable grounds to believe that X and Y are in the house. If they should fail to obtain an injunction based upon that contention, plaintiffs seek an injunction restraining any such entries which are based upon anonymous tips or which otherwise do not meet constitutional standards.

Defendant, represented by the Attorney General of the State, challenges not only plaintiffs' interpretation of the Fourth Amendment and their claim of discrimination, but also their standing to seek the relief prayed and the propriety of such relief under the circumstances shown by the evidence.

The case is now before the Court on an application for a preliminary injunction. Forty-two witnesses have testified, and the records of the police were reviewed during the hearing and summarized in a report by a team of special masters chosen from the Junior Bar Association. There is little dispute about the facts.

### Facts

On December 24, 1964, at about 9:45 p. m., several persons committed an

armed robbery of a liquor store at 2002 Greenmount Avenue in Baltimore, during which Police Lieutenant James Maskell was shot and seriously wounded. A suspect was apprehended at or near the scene of the crime and was questioned. Immediately thereafter several officers visited homes in the area in search of other persons believed to be involved. At about 4:50 a. m. on December 25, Police Sergeant Jack Cooper, a uniformed officer in a cruiser, who was participating in the search, was found fatally shot near his car. The police believed that Samuel Veney was involved in the robbery and in the shooting of Sergeant Cooper.

Early on the morning of December 25, a Municipal Court Judge issued warrants for the arrest of Samuel Veney and his brother Earl, charging them with robbery of the liquor store and with assaulting and shooting Lieutenant Maskell.[1] The police had information justifying their belief that the Veney brothers were armed and extremely dangerous.

On December 25, the Police Commissioner decided to form a special squad to investigate the crimes, composed of officers from the Homicide Bureau, the Robbery Squad, the Northeastern District and other units under the command of Captain Mahrer of the Northeastern District. About 50 or 60 men were members of the squad at one time or another. The police began promptly to investigate various premises, searching for the Veneys and other suspects. All except the Veneys were in custody before December 28.

Between December 25 and January 12 the police made more than 300 turn-ups in an effort to locate and arrest the Veneys. The phrase "turn-up" as used by the police means an investigation of a particular location, and usually but not always includes a search of the premises. Most of the premises searched were private residences, but there were a few turn-ups at schools, taverns, pool halls, vacant houses, vacant lots, etc. The Veneys are Negroes, and most of the dwellings searched were occupied by Negroes. After the first nine days the number of turn-ups decreased to an average of seven or eight a day.

At 6:44 a. m. on December 25, Inspector German had sent out a teletyped order to all districts directing that all officers turning-up a house in connection with the investigation should arrange to have one of the two emergency vehicles accompany them. Each emergency vehicle carries shotguns, submachine guns, tear gas and bullet-proof vests, as well as a variety of equipment used in rescue work. Each is manned by a crew of four men specially trained in handling the weapons and other equipment. The emergency unit was organized in June 1963, and assists in nine or ten arrests monthly in addition to its rescue work. It was used in connection with these turn-ups to protect the police, to protect the public, and to insure that the persons named in the warrants would be captured if they were discovered. During the first two days the police conducted the investigation primarily on the basis of leads developed from questioning the persons in custody and the family and acquaintances of the Veneys. Thereafter most of the turn-ups were made as the result of tips, many of them anonymous, as to the whereabouts of the Veneys, whose pictures and descriptions were widely circulated in the press. Some tips were received through a newspaper which offered a reward for information leading to the arrest of the Veneys and promised not to disclose the names of callers. All tips, except those which were patently frivolous, were investigated, and in most cases resulted in searches of the buildings.

The police records with respect to many of the searches are sketchy and in-

---

[1]. No question with respect to the validity of the warrants is raised in this case. On December 28 the Criminal Court of Baltimore issued capiases for the arrest of the Veneys after grand jury present-ments had charged them and three other men with the liquor store robbery and shooting, and had charged Samuel Veney with murdering Sergeant Cooper.

complete. Frequently all that is shown is that a particular address was turned-up on a particular day.

The police did not apply for or obtain search warrants for the search of any of the more than 300 premises they entered. The decision to enter a house was usually made by the lieutenant or sergeant in charge when the tip was received. The entries were made at all hours of the day and night, usually within 30 or 45 minutes after receiving the tip. There was no search for or seizure of property or evidence in any of the dwellings or other buildings which were entered.

The squads which turned-up the eight dwellings with respect to which testimony was taken numbered between ten and twenty officers and detectives, and it appears that most turn-ups were made by at least ten officers. Men from the special squad and from the emergency unit would sometimes be joined by radio cars with additional men from the local district. The Commissioner gave Captain Mahrer authority to call as many men or cars as he needed for this investigation. Ordinarily such authority is not given to a captain, but this was an unusual investigation in terms of its size and because two officers were believed to have been shot in one day by the same person or persons.

Immediately after the decision to investigate a tip was made, a surveillance group of plain-clothes officers would drive past the building to locate entrances, exits, alleyways, etc. The surveillance team did not make inquiries in the neighborhood about the occupants or conduct any other investigation of the tips, except to observe the character of the neighborhood. Turn-ups were occasionally called off on their recommendation. The surveillance team would meet the main group, including the crew of the emergency vehicle, at a nearby point. Bullet-proof vests would be issued to four men. Officers specially trained in handling submachine guns and shotguns would be issued weapons. Usually, the houses were surrounded and some of the officers were directed to train their weapons on windows and doors. Four men wearing bullet-proof vests and carrying heavy weapons would go to the front door and knock. They would be followed or accompanied by the supervising officer, a sergeant or lieutenant. As soon as an occupant opened the door, the first man would enter the house to look for any immediate danger, and the supervising officer would then talk to the person who had answered the door. Few stated any objection to the entry; some were quite willing to have the premises searched for the Veneys, while others acquiesced because of the show of force.

The officers involved worked exceptionally long hours. Some were polite and considerate of the occupants. Others were abrupt, and without adequate explanation of their purpose, flashed lights on beds where children were sleeping and otherwise upset the occupants of the home being searched.

A disabled veteran was patted-down, i. e. checked for a weapon, after the police had entered his grandmother's dwelling, about a block from the corner where a policeman had been shot at and the badge of his cap struck by a bullet a few days before. Another man claimed that he had been patted-down after another entry, but since he was clad only in his pajama bottoms, the denial of the officers is more credible than his claim. When the police raided a pool hall on Walbrook Avenue in response to a call from a man who falsely represented himself as the proprietor and said that the Veneys were there, the police searched all patrons of the pool hall for weapons. No other patting-down is shown by the evidence.

On Friday, January 8, 1965, at 9:00 a. m., plaintiffs' attorneys brought their complaint to my chambers and asked for a temporary restraining order. In accordance with uniform practice, the Court called counsel for the defendant, in this case the Deputy Attorney General, who came to the Court's chambers promptly and agreed to a hearing that afternoon. At that hearing the Deputy

Attorney General moved orally to dismiss the complaint for lack of jurisdiction and lack of standing, but stated that the Police Commissioner would promptly issue a general order dealing with the problems raised by the complaint. The Court denied the oral motion without prejudice to defendant's right to raise the point later, denied plaintiffs' request for a temporary restraining order in view of the promised issuance of a general order by the Commissioner, and set the case for hearing on the following Thursday on plaintiffs' application for a preliminary injunction.

On Monday, January 11, defendant Police Commissioner issued General Order No. 10388, set out in note 2 below. Between January 9 and January 11, there were seven turn-ups. On January 12, there was one. Thereafter there were only two, for each of which the police obtained search warrants.

On January 14 the Court denied defendant's motion for judgment on the pleadings, and the taking of testimony began. It was completed on January 27.

Briefs have been filed and the case has been argued orally by counsel for the respective parties and by amici curiae appointed by the Court.[3]

On December 29, a United States Commissioner had issued a fugitive felon arrest warrant for the Veneys. They were arrested in New York on March 11, by a squad of twenty-five agents of the FBI.

### Discussion

#### I.

■ The Court has jurisdiction of the case under 28 U.S.C.A. § 1343 and 42 U.S.C.A. § 1983. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961); McNeese v. Board of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); Jordan v. Hutcheson, 4 Cir., 323 F.2d 597 (1963); Cohen v. Norris, 9 Cir., 300 F.2d 24 (1962).

It is a spurious class action, whether the class be considered to be (A) all residents of Baltimore, whose rights under the Fourth Amendment, enforceable

2. "General Order: January 11, 1965.
 No. 10388

"Subject: Service of Arrest Warrants

"The question has recently arisen as to the precise scope of the authority conferred upon police officers by arrest warrants, and specifically whether such warrants authorize entry upon private property for the purpose of locating and arresting the defendant named in the warrant.

"A police officer may make a peaceable or a forcible entry to search any premises for the purpose of arresting a person for whom an arrest warrant has been issued, if, but only if, the officer has probable cause to believe the accused person to be on the premises to be searched.

"In this context, 'probable cause' is said to exist where the facts and circumstances within the officer's knowledge and . of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that the accused person is on the premises to be searched.

"The officer should, where practicable, seek admission to the suspected premises by announcing his identity, the existence of the arrest warrant, and his desire to search for and arrest the accused person. If the officer has any doubt as to the existence of 'probable cause', he should immediately either seek the issuance of a search warrant, or consult with the office of the State's Attorney for Baltimore City or of the Attorney General of the State of Maryland before attempting entry upon private premises in search of the accused person.

"In all instances, consideration should be given to the convenience of the persons whose premises are to be searched and the other residents of the neighborhood. In this connection, it may at times be necessary, and in the public interest, to make such searches in the nighttime when most of the residents would not be on the street, when the possibility of warning and escape would be less, and when greater safety would be afforded the arresting officer.

"Copies: Inspectors, All Districts, Divisions, Units"

3. Three Baltimore lawyers—the immediate past President of the Maryland State Bar Association, the President-elect of that Association, and the President of the Bar Association of Baltimore City.

against the states through the Due Process Clause of the Fourteenth Amendment, are alleged to be threatened; or (B) all Negro residents, whose rights to equal protection under the Fourteenth Amendment, are alleged to be threatened. It has been argued that, with respect to the claims asserted on behalf of each class, plaintiffs may maintain this suit only if each member of the class would have the right to assert the alleged claim and to file and prosecute such an action, since plaintiffs do not allege that their homes are more likely to be searched in the future than the homes of other members of the class. Granted, but that does not mean that this action cannot be maintained.

■ The complaint alleges that the police have deprived many citizens of their Fourth Amendment rights, by entering their homes to search for the Veneys without reasonable grounds to believe that the Veneys were in their respective homes, and that such deprivations are likely to continue in the future. Based on those allegations, any householder or other resident of Baltimore who alleges that he is so threatened might file and prosecute such an action. Jordan v. Hutcheson, supra; Jeffers v. Whitley, 4 Cir., 309 F.2d 621 (1962); Potts v. Flax, 5 Cir., 313 F.2d 284 (1963).

Whether the relief prayed should be granted is another matter, depending upon the facts proved, the proper construction of the Fourth and Fourteenth Amendments, and other applicable legal principles, including the need to consider and weigh the various public and private interests involved before issuing such an injunction as is sought in this case.

■ With respect to the claimed denial of equal protection, the complaint alleges: "Plaintiffs are informed and believe that the defendant's policy, pattern and practice of making and authorizing such unreasonable searches and seizures has been particularly directed at the homes of Negro residents of the City of Baltimore. Such acts deny plaintiffs and other Negroes their right to equal protection of the laws as protected by the Fourteenth Amendment to the Constitution of the United States by systematically depriving them of the equal right to privacy and to be secure in their persons and homes against unlawful and arbitrary intrusions by police officials, on the basis of race or color." Based on those allegations, any Negro resident of Baltimore who alleges that he is so threatened might file and prosecute such an action.

■ The evidence in this case fails to show a denial of equal protection to any person because of his race or color.[4] Most but not all of the premises searched were occupied by Negroes, but that was because the Veneys are Negroes and most of the information received related to their presence or possible presence in Negro homes or places where Negroes customarily congregate. The remainder of this opinion will deal with the rights of all residents of Baltimore, whatever their race or color.

## II.

The Fourth Amendment, which was made applicable to the States by the Due Process Clause of the Fourteenth Amendment, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

4. The evidence does show what has become common knowledge in Baltimore—that the relations between the Negro community and the police have deteriorated seriously. The Court is grateful to the amici curiae, who with the approval and cooperation of counsel for both sides were instrumental in the organization of a bi-racial committee which has begun its efforts to establish better communications between the Negro community and the police, and thereby to improve the relations between them.

■ The decisions of the Supreme Court have repeatedly emphasized that an essential purpose of the Fourth Amendment is to shield the citizen from unwarranted intrusions into his privacy. Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); Jones v. United States, 357 U.S. 493, 498, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958); Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). It prohibits "unreasonable" searches. The parties agree that even though the police hold a warrant for the arrest of a person charged with crime, they may not enter a dwelling or other private building to arrest such person without reasonable grounds to believe that such person is in the building, unless there is consent to such entry.

■ There is no fixed formula for the determination of reasonableness. The phrase "reasonable grounds", like "probable cause", means more than bare suspicion. Reasonable grounds exist where facts and circumstances within the officers' personal knowledge or facts and circumstances of which they have reasonably trustworthy information are sufficient to warrant a man of reasonable caution to believe that the person wanted is on the premises. See Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925); Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959); Henry v. United States, 361 U.S. 98, 102, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), which dealt with "probable cause" to believe that a criminal offense had been or was being committed. As the Supreme Court said in Brinegar v. United States:

"These long-prevailing standards seek to safeguard citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." 338 U.S. at 176, 69 S.Ct. at 1311.

■ Anonymous tips, without something more to support or corroborate them, do not constitute reasonable grounds. Costello v. United States, 9 Cir., 298 F.2d 99 (1962), cert. den. 376 U.S. 930, 84 S.Ct. 699, 11 L.Ed.2d 650 (1964); Contee v. United States, D.C. Cir., 94 U.S.App.D.C. 297, 215 F.2d 324 (1954); United States v. Ruffner, D.Md., 51 F.2d 579 (1931). See also Aquilar v. United States, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964).

Most of the eight turn-ups as to which witnesses testified and most of the other turn-ups involved in this case were made without reasonable grounds to believe that the Veneys were on the premises. Most were made on anonymous tips alone, without any investigation to determine who the occupants of the house were, or anything else to corroborate them. As a result the homes of many respectable citizens were subjected to entry by force under circumstances which were disturbing to children and others in the house.

■ Defendant concedes that many entries were made without probable cause, but contends that the occupants consented in all or substantially all of the cases. In some instances there was no one there to consent. In others there was merely acquiescence after at least one officer armed with a shotgun or submachine gun had already entered the door. Acquiescence under those circumstances does not constitute consent. Amos v. United States, 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654 (1921).

Entry into a dwelling without probable cause and without consent must be severely condemned, whether the home be in the poorest part of the city or in an impressive suburban development. All

residents of Baltimore are equally entitled to the constitutional right of privacy.

## III.

Plaintiffs go further and argue that even though the officers have reasonable grounds to believe that a man for whom they hold an arrest warrant is in a particular house, not his own, the officers must obtain a search warrant before entering the house, in the absence of consent or exceptional circumstances, such as hot pursuit. Plaintiffs concede that no court has so held.

In Love v. United States, 4 Cir., 170 F.2d 32 (1948), cert. den. 336 U.S. 912, 69 S.Ct. 601, 93 L.Ed. 1076 (1949), revenue officers went to appellant's home, which they entered to search for Foster, a person for whom they had an arrest warrant. In the course of the search, the officers discovered a distillery in operation. On appellant's motion to suppress evidence of the distillery, the trial court found that the officers did not enter the house for the purpose of searching for or finding evidence of the commission of a crime, but entered in the bona fide belief that Foster was taking refuge in the house and discovered the violation while making search for Foster's whereabouts. The trial court's denial of the motion to suppress the evidence was affirmed on appeal. The Fourth Circuit said: "The officers were rightfully in the house (State v. Mooring, 115 N.C. 709, 20 S.E. 182) and the discovery of the unlawful still was incidental to [the] lawful search for Foster." 170 F.2d at 33.

In the North Carolina case relied on by the Fourth Circuit, the Court said:

"It seems to be well settled by the courts both in this country and in England, that where an officer 'comes armed with process founded on a breach of the peace,' he may, after demand of admittance for the purpose of making the arrest and refusal of the occupant to open the doors of the house, lawfully break them, in order to effect an entrance and if he act in good faith in doing so, both he and his posse comitatus will be protected." State v. Mooring, 115 N.C. at 710–711, 20 S.E. at 182 (1894).

That case, in turn, relied on Commonwealth v. Reynolds, 120 Mass. 190 (1876), the leading case in this country. The doctrine of these and other cases is embodied in the American Law Institute Restatement of the Law of Torts, which states in section 204:

"The privilege to make an arrest for a criminal offense carries with it the privilege to enter land in the possession of another for the purpose of making such an arrest, if the person sought to be arrested is on the land or if the actor reasonably believes him to be there." [5]

Section 206 of the Restatement reads:

"One is privileged, after explanation of his errand and demand for admittance, or without such explanation and demand if he reasonably believes such to be impractical or useless, to break and enter a dwelling or use force to the person to enter the dwelling * * *

"(b) although the person sought is not in the dwelling, if the actor reasonably believes him to be there, and the entry is made in the exercise of a privilege

"(i) to make a criminal arrest under a warrant valid or fair on its face. * * * * "

The Restatement rules find support in the law of Maryland. In Wanzer v.

---

5. Comment c to section 204 states:
"It is immaterial that the person sought to be arrested is neither the possessor nor an occupant of the land. It is sufficient that he is actually on the land or that the actor reasonably believes him to be there. The fact that he is the possessor or the occupant may, however, be of importance, in the event that he is not on the land, in determining whether the actor's belief of his presence is reasonable."

State, 202 Md. 601, at 609, 97 A.2d 914 at 917 (1953), Chief Judge Sobeloff said: "Entry on private premises to execute an arrest warrant is legal." See also Henson v. State, 236 Md. 518, 204 A.2d 516 (1964); Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963); Martin v. United States, 4 Cir., 183 F.2d 436 (1950).

Plaintiffs contend that the Restatement rule was announced before the Supreme Court held that the Fourth Amendment was enforceable against the States under the Due Process Clause of the Fourteenth Amendment, and that the cases which support the Restatement rule did not, therefore, consider Fourth Amendment rights. It is true that the state decisions cited did not consider the Fourth Amendment, but that Amendment was binding on the Fourth Circuit when it decided Love v. United States, 170 F.2d 32 (1948), and many of the States have similar provisions in their constitutions.[6] See Mason v. Wrightson, 205 Md. at 481, 486, 109 A.2d 128 at 130 (1954).

Plaintiffs cited Morrison v. United States, D.C.Cir., 104 U.S.App.D.C. 352, 262 F.2d 449 (1958), in support of their argument that no distinction should be made between searches for persons and searches for things, insofar as the Fourth Amendment protection of the right of privacy is concerned. That case, however, does not conflict with the decision of the Fourth Circuit in Love v. United States, supra, or with the Restatement rules noted above. In the Morrison case the Court held that where officers, without any warrant, entered de-fendant's house primarily to search for him, property seized during the search should not have been admitted in evidence at the trial. The Court said:

> "We think that under the authorities officers without a warrant cannot enter, even without actually breaking, a private dwelling to search for a suspected felon, no permission being given and no circumstances of necessitous haste being present." 262 F.2d at 454.

The Court distinguished the Love case, in which the revenue officers had an arrest warrant.[7]

The precise question raised by plaintiffs' argument has never been presented to the Supreme Court. But the general principles announced by the Court in cases dealing with searches made in connection with an arrest and other searches made without a search warrant, indicate what the answer should be.

In Carroll v. United States, 267 U.S. 132, 149, 45 S.Ct. 280, 64 L.Ed. 543 (1925), the Court said:

> "The Fourth Amendment is to be construed in the light of what was deemed an unreasonable search and seizure when it was adopted, and in a manner which will conserve public interests as well as the interests and rights of individual citizens."

It is not necessary to repeat the history reviewed in Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), Frank v. Maryland, both majority and dissenting opinions, 359 U.S. 360 and 374, 79 S.Ct. 804, 3 L.Ed.2d 877 (1959), Marcus v. Search Warrants, 367

---

6. In 1776, the State of Maryland incorporated, as part of its Declaration of Rights, the principle: "That all warrants, without oath or affirmation, to search suspected places, or to seize any person or property, are grievous and oppressive; and all general warrants to search suspected places, or to apprehend suspected persons, without naming or describing the place, or the person in special, are illegal, and ought not to be granted." That provision remains in the Maryland Constitution to this day. Maryland Declaration of Rights, Article 26.

7. The Court also distinguished its earlier case of Gibson v. United States, D.C.Cir., 80 U.S.App.D.C. 81, 149 F.2d 381 (1945), where it had cautioned: "We do not mean to say that an officer who has a warrant for the arrest of A, and who reasonably believes that A is in the house of B, may not, after demanding admittance and giving due notice of his warrant, force entrance in order to search for and arrest A." 149 F.2d at 383, fn. 5.

U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961), and most recently Stanford v. Texas, 379 U.S. 476, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965). The history supports the conclusion that the principal attack of the Fourth Amendment was against general warrants, which gave officers of the Crown blanket authority to search where they pleased for evidence of crime or for goods subject to forfeiture, or to search for and arrest unnamed persons.

■ The right of privacy guaranteed by the Fourth Amendment is not restricted within those historic bounds; but neither the history nor the decisions of the State and Federal Courts suggest that the Fourth Amendment requires a search warrant to enter a house to arrest a person specifically named in an arrest warrant, where there are reasonable grounds to believe that the person named in the warrant is in the house.

Plaintiffs call attention to such cases as Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948), which emphasize the desirability of obtaining a search warrant based upon the independent judgment of a magistrate, where practicable, before the police embark upon a search for evidence of a crime or for goods subject to forfeiture. Plaintiffs argue that the same principle applies to an entry by the police to search for and arrest a suspected felon. The privacy of the occupants of the house is, of course, an important consideration. But it must be weighed against the interest of all the people that criminals be arrested and brought to trial, especially where, as in this case, a warrant has been issued, based upon the independent judgment of a magistrate, authorizing the officers to arrest a particular individual.

In United States v. Rabinowitz, 339 U.S. 56, 65–66, 70 S.Ct. 430, 435, 94 L.Ed. 653 (1950), dealing with a motion to suppress evidence seized without a search warrant but after an arrest, the Court said:

> "A rule of thumb requiring that a search warrant always be procured whenever practicable may be appeal-ing from the vantage point of easy administration. But we cannot agree that this requirement should be crystallized into a *sine qua non* to the reasonableness of a search. * * * Some flexibility will be accorded law officers engaged in daily battle with criminals for whose restraint criminal laws are essential.

> "It is appropriate to note that the Constitution does not say that the right of the people to be secure in their persons should not be violated without a search warrant if it is practicable for the officers to procure one. The mandate of the Fourth Amendment is that the people shall be secure against *unreasonable* searches. * * * The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends upon the facts and circumstances—the total atmosphere of the case. It is a sufficient precaution that law officers must justify their conduct before courts which have always been, and must be, jealous of the individual's right of privacy within the broad sweep of the Fourth Amendment."

In Brinegar v. United States, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879, which also dealt with a seizure of evidence without a search warrant the Court said:

> "The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."

This Court concludes that where the police hold a warrant for the arrest of a person charged with crime, they may enter a dwelling or other private building to arrest such person if they have reasonable grounds to believe that the

person is in the building. It is not necessary to decide in this case whether the same rule applies to an entry made without an arrest warrant but with reasonable cause to believe that a felony had been committed and with reasonable grounds to believe that the felon is on the premises. See Jones v. United States, 357 U.S. 493, at 499–500, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958).

### IV.

We come finally to the question whether under all the circumstances a preliminary injunction should issue.

Such an injunction would be difficult to frame, in view of the discretion which must be allowed to the police under the Supreme Court decisions quoted above. It would also be difficult to enforce, and its enforcement would place severe burdens on the police and on this Court. Those difficulties, however, should not bar the issuance of an injunction, if an injunction is necessary to protect the important rights of all citizens and residents of Baltimore which are involved in this case.

The Court said on the opening day of the hearing that everyone in the courtroom was on both sides of this case. Every resident of the City should be interested in protecting the privacy of his home granted by the Fourth and Fourteenth Amendments. On the other hand, every resident of the City should be interested in seeing that the police are not unduly hampered in their efforts to arrest persons who have been charged with crime or whom the police reasonably believe to have been guilty of felonies. Striking a proper balance between those important interests is not always easy.

One or two of the officers who testified in this case indicated that they would probably act in the future on anonymous tips if they felt the circumstances required it. But this Court has now stated the basic principles which must be observed by the police in determining whether there are reasonable grounds for a contemplated entry. The Court is satisfied that the Police Commissioner and other police officers will make a bona fide effort to observe those rules. They did observe them during the remainder of the search for the Veneys after the Commissioner issued General Order No. 10388 on January 11.

Where constitutional rights have been violated as the result of discriminatory action by state officials, and it is likely that such discriminatory action will be continued in the future, a court has little or no discretion to refuse an injunction. Henry v. Greenville Airport Commission, 4 Cir., 284 F.2d 631 (1960). In this case, however, there has been no proof of discriminatory action. The rights and interests of all residents of Baltimore are involved in this case. The constitutional rights of some of the plaintiffs of other witnesses and of other citizens have been violated by the police on separate though related occasions. The Court has found that the violations are not likely to be resumed, although some officers will no doubt make mistakes in individual instances in the future.

Under these circumstances, standards of the public interest measure the propriety and need for injunctive relief. Hecht Co. v. Bowles, 321 U.S. 321, 331, 64 S.Ct. 587, 88 L.Ed. 754 (1944). "Courts of equity may and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 782 (1937), quoted repeatedly since, most recently in United States v. First National City Bank, 379 U.S. 378, 383, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965). And as Mr. Justice Cardozo said in Hawks v. Hamill, 288 U.S. 52, at p. 60, 53 S.Ct. 240, at page 243, 77 L.Ed. 510 (1933): "Caution and reluctance there must be in special measure where relief, if granted, is an interference by the process of injunction with the activities of state officers discharging in good faith their supposed official duties."

The Veneys have now been arrested. Other frustrating cases will, however, arise in the future, and will tempt the police to engage in searches, raids or other activities which pass the line of reasonableness. The police must remember that although the killing of a police officer in the course of his duty is a most serious crime, which shocks the whole community, it is not an excuse for violating anyone's constitutional rights. Any policemen who have in the past been contemptuous of the rights and feelings of Negroes must recognize that all persons have equal constitutional rights and are equally entitled to courtesy and consideration, whatever their race or station in life. And any members of the Negro community who have considered all policemen their enemies must recognize the responsibilities borne by the police in the difficult and dangerous duty of protecting the public, and must realize their own responsibility to support rather than hinder the officers.

Since the Court believes that the police will make an honest effort to observe their constitutional responsibilities, no preliminary injunction will be issued. The case will not be dismissed, but may be called for trial if it appears necessary.