Samuel James **LANKFORD** and Corinthia Julia Lankford, his wife, Claude Tompkins and Rev. Elizabeth Tompkins, his wife, Walter Summers and Regina Summers, his wife, and Arthur Rayner, Appellants,

v.

George **GELSTON**, as Commissioner of Police of Baltimore City, Appellee.*

No. 10384.

United States Court of Appeals Fourth Circuit.

Argued June 2, 1966.

Decided June 23, 1966.

James M. Nabrit, III, New York City, and Anthony G. Amsterdam, Washing-

---

* (Bernard J. Schmidt, Police Commissioner when this case was heard below, has retired from office and was succeeded by General George M. Gelston as Interim Police Commissioner. The latter has been substituted as appellee at the instance of counsel for appellants.)

ton, D. C. (Jack Greenberg, Melvyn Zarr, Michael Meltsner, New York City, Juanita Jackson Mitchell, Tucker R. Dearing and W. A. C. Hughes, Jr., Baltimore, Md., on brief), for appellants.

Robert C. Murphy, Deputy Atty. Gen. of Maryland (Thomas B. Finan, Atty. Gen. of Maryland, on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF, BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges, sitting en banc.

SOBELOFF, Circuit Judge:

Negro families of Baltimore City, four in number but acting in behalf of others similarly situated, as well as in their own behalf, instituted an action in the United States District Court for the District of Maryland, seeking injunctive relief against the Police Commissioner of Baltimore City to prevent further invasions of their right to privacy guaranteed by the Fourth and Fourteenth Amendments to the Constitution. Jurisdiction is grounded on 28 U.S.C.A. § 1343, as authorized by 42 U.S.C.A. § 1983.[1]

The District Court heard the testimony of forty-two witnesses and received a summary of the police records from a team of special masters chosen from the membership of the Junior Bar Association of Baltimore City. This case, which has attained considerable notoriety, stems from the efforts of the Baltimore Police Department to capture Samuel and Earl Veney, two brothers who shot and killed one policeman and seriously wounded another. During a nineteen-day period in December, 1964, and January, 1965, the police conducted searches of more than 300 houses, most of them private dwellings. The searches

were based in almost every instance on unverified anonymous tips. In none did the police have a search warrant. Although the court found that the police, in conducting these searches at all hours of the day and night, upon telephone tips from unknown persons, had deprived plaintiffs and others of their constitutional rights, it refused to issue an injunction and denied plaintiffs relief. The court, however, retained jurisdiction of the case in order to process expeditiously any future claim of invasion of the plaintiffs' rights. 240 F.Supp. 550 (D.Md. 1965).

There is no dispute over the facts. On the evening of December 24, 1964, several persons committed an armed robbery of a liquor store in Baltimore City, in the course of which Police Lieutenant James Maskell was shot and seriously wounded. A suspect was soon apprehended near the scene of the crime and after questioning him, several police officers visited homes in the area in search of other suspects. At about 4:50 a. m., on December 25, Police Sergeant Jack Cooper, a uniformed officer in a cruising car and a member of the search party, was found fatally shot near his cruiser.

Early in the morning of December 25, warrants were issued for the arrest of Samuel Veney and his brother Earl, charging them with the robbery of the liquor store and with assaulting and shooting Lieutenant Maskell.[2] The Veney brothers were justifiably believed by the police to be armed and extremely dangerous. Later that day, the then Police Commissioner, Bernard Schmidt, authorized a special squad to be formed under the command of Captain Joseph Mahrer to search for the Veneys. About 50 or 60 police officers were members of the squad at one time or another.

---

1. Baltimore City is a municipal corporation of the State of Maryland, but its Police Commissioner is an appointee of the Governor. Chap. 742, Acts of General Assembly, 1957, amending sec. 526 of the Charter and Public Local Laws of Baltimore City (1949 ed.). Both at trial and

on appeal the Police Commissioner was represented by the Attorney General of Maryland. Art. 32A, § 2, Ann.Code of Md. (1957).

2. The police believed that the Veneys had also killed Sergeant Cooper.

Between December 25 and January 12, the Baltimore police made more than 300 "turn-ups" in an unsuccessful effort to locate and arrest the Veneys. In police parlance a turn-up is an investigation of a location and usually includes a search of the premises. Most of the searches here were of private residences. The Veneys are Negroes, and most of the dwellings searched were occupied by Negroes.[3]

The court found that:

"The police records with respect to many of the searches are sketchy and incomplete. Frequently all that is shown is that a particular address was turned-up on a particular day.

"The police did not apply for or obtain search warrants for the search of any of the more than 300 premises they entered." 240 F.Supp. at 553–554.

A police emergency vehicle carrying shotguns, submachine guns, tear gas apparatus, and bulletproof vests accompanied the men on every search. Before each turn-up a surveillance team of plainclothesmen would drive past the building to locate exits, alleyways, etc., but there were no inquiries in the neighborhoods about the houses to be searched nor was there any other investigation of the tips, except to observe the character of the neighborhood.

Four officers carrying shotguns or submachine guns and wearing bulletproof vests would go to the front door and knock. They would be accompanied or followed by supervising officers, a sergeant or lieutenant. Other men would surround the house, training their weapons on windows and doors. "As soon as an occupant opened the door, the first man would enter the house to look for any immediate danger, and the supervising officer would then talk to the person who had answered the door. Few stated any objection to the entry; some were quite willing to have the premises searched for the Veneys, while others acquiesced because of the show of force." 240 F.Supp. at 554.

"The officers involved worked exceptionally long hours. Some were polite and considerate of the occupants. Others were abrupt, and without adequate explanation of their purpose, flashed lights on beds where children were sleeping and otherwise upset the occupants of the home being searched." 240 F.Supp. at 554.

Few specific instances need be detailed to illustrate the consequences of police reliance on anonymous tips and the terrifying experiences to which occupants of the searched homes were subjected.

Samuel Lankford and his wife, who have six children, have resided at 2707 Parkwood Avenue since 1949. Mr. Lankford has worked at the U.S. Post Office in Baltimore for over ten years. At about 1:15 a. m. on January 2, 1965, Lieutenant Robert Hewes was told by a communications center officer that he had received a call that the Veney brothers were at this address with a family named Garrett. A few minutes before 2:00 a. m. Lieutenant Hewes and his search party converged upon Parkwood Avenue. Upon their arrival in the neighborhood they met on the street a Negro

---

3. The special masters' summary of the police records listed 300 searches by dates:

| Date | Searches | Date | Searches |
|---|---|---|---|
| 12/24 | 0 | 1/3 | 7 |
| 12/25 | 4 | 1/4 | 18 |
| 12/26 | 39 | 1/5 | 5 |
| 12/27 | 16 | 1/6 | 10 |
| 12/28 | 16 | 1/7 | 4 |
| 12/29 | 28 | 1/8 | 7 |
| 12/30 | 35 | 1/9 | 4 |
| 12/31 | 54 | 1/10 | 2 |
| 1/1 | 26 | 1/11 | 1 |
| 1/2 | 23 | 1/12 | 1 |

man, described by the lieutenant as "respectable looking," who identified himself as the person that had called the communications center. He told Lieutenant Hewes that he had been told by a newspaper boy that two men resembling the Veneys had entered a house on Parkwood Avenue. At 2:00 a. m. a search party led by the lieutenant knocked on the door, and Mrs. Lankford, awakened by the knock, opened the door. The officers entered the house and began their search while the lieutenant talked with the woman. She told him that her name was not Garrett. At the trial she denied that the officers asked for or were given permission to search, and Lieutenant Hewes acknowledged that his men had already gone to the second floor while he was talking with her. The husband was awakened in his second floor bedroom by two flashlights shining in his face and found four men with shotguns in his room. They questioned him, while other officers searched the remaining rooms including the children's bedrooms, and left.

Mr. and Mrs. Wallace have made their home at 2408 Huron Street for 21 years. They live with a three-year old son, three daughters, Lucinda (a Baltimore public school teacher), Harrietta (a college student), and Sharon (a high school student), and two other relatives. At 8:30 p. m. on December 30, 1964, Lieutenant Coll of the Southwest District was told by a clerk at another police station that she had received an anonymous call from a man who said that the Veneys were being sheltered at this address. Lieutenant Coll testified that since this was the first time that the Veneys had been placed in this neighborhood, he felt that an investigation was in order. A little after 9:00 p. m. Lieutenant Coll led about 14 officers to the house. When the po-

lice arrived, Lucinda Wallace was showing slides to a group of her family and guests. Mr. and Mrs. Wallace were both out, Mrs. Wallace at a beauty shop she operated four doors away. Six officers armed with shotguns and rifles entered and searched the home; others who were stationed outside would not allow Mrs. Wallace to enter and refused to explain what was happening. Reduced to tears, she was finally admitted to her home, where she was joined by her children, all crying hysterically. As the policemen were departing, they told Lucinda and her mother that they had received an anonymous call that the Veneys were in the house.

At the trial several police officers, each with long experience on the Baltimore police force, testified that in serious cases it was routine practice to make searches of homes on the basis of anonymous calls. They recognized the difficulty in authenticating such tips, and testified that they attempted to do so by evaluating the tone of voice used by the caller. The officers further stated that not infrequently they would also conduct searches based on tips received from the outside and transmitted to them by police telephone clerks.

On January 8, 1966, plaintiffs' attorneys brought the complaint to the chambers of the District Judge and asked for a temporary restraining order. At a hearing held that afternoon, the Deputy Attorney General represented to the court that the Police Commissioner would promptly issue a general order dealing with the problems raised in the complaint. Based on that representation, the District Court denied the request for a temporary restraining order, and set the case for trial on January 14.

On January 11 the Police Commissioner did issue General Order No. 10388.[4]

4. "General Order: January 11, 1965.
    No. 10388
    "Subject: Service of Arrest Warrants
    "The question has recently arisen as to the precise scope of the authority conferred upon police officers by arrest warrants, and specifically whether such warrants authorize entry upon private property for the purpose of locating and arresting the defendant named in the warrant.
    "A police officer may make a peaceable or a forcible entry to search any premises for the purpose of arresting a person for

In essence the Order forbids police officers from searching "any premises for the purpose of arresting a person for whom an arrest warrant has been issued" unless "the officer has probable cause to believe the accused person to be on the premises to be searched." The determination of what constitutes probable cause is still left to the policeman, and there is nothing in the Order which specifically prohibits officers from conducting searches grounded only on anonymous tips, which is precisely the evil to which the Complaint was addressed. We therefore find nothing in General Order No. 10388 which would make the issuance of an injunction unnecessary.

In refusing injunctive relief, the District Court emphasized the reluctance of the federal judiciary to employ its equity power to control police practices [5] and noted that

"this Court has now stated the basic principles which must be observed by the police in determining whether there are reasonable grounds for a contemplated entry. The Court is satisfied that the Police Commissioner and other police officers will make a bona fide effort to observe those rules. They did observe them during the remainder of the search for the Veneys after the Commissioner issued General Order No. 10388 on January 11." 240 F.Supp. at 561.

We conclude, however, that in striking the balance between the role of the federal court in the preservation of the constitutional rights of the appellants and the independence of state officials, the District Court erred when it refused to issue an injunction prohibiting the police from conducting searches based only on uncorroborated anonymous tips and hence without probable cause.

This case reveals a series of the most flagrant invasions of privacy ever to come under the scrutiny of a federal court. The undisputed testimony indicates that the police in conducting the wholesale Veney raids were engaging in a practice which on a smaller scale has routinely attended efforts to apprehend persons accused of serious crime. If denying relief in these circumstances should be held a proper exercise of judicial restraint, it would be difficult to envision any case justifying judicial intervention. The parties seeking redress have committed no acts warranting violation of the privacy of their homes;

---

whom an arrest warrant has been issued, if, but only if, the officer has probable cause to believe the accused person to be on the premises to be searched.

"In this context, 'probable cause' is said to exist where the facts and circumstances within the officer's knowledge and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that the accused person is on the premises to be searched.

"The officer should, where practicable, seek admission to the suspected premises by announcing his identity, the existence of the arrest warrant, and his desire to search for and arrest the accused person. If the officer has any doubt as to the existence of 'probable cause', he should immediately either seek the issuance of a search warrant, or consult with the office of the State's Attorney for Baltimore City or of the Attorney General of the State of Maryland before attempting entry upon private premises in search of the accused person.

"In all instances, consideration should be given to the convenience of the persons whose premises are to be searched and the other residents of the neighborhood. In this connection, it may at times be necessary, and in the public interest, to make such searches in the nighttime when most of the residents would not be on the street, when the possibility of warning and escape would be less, and when greater safety would be afforded the arresting officer.

"Copies: Inspectors, All Districts, Divisions, Units."

5. But see, for example, cases where courts have enjoined the police from enforcing segregation. Due v. Tallahassee Theatres, Inc., 333 F.2d 630 (5th Cir. 1963); Anderson v. City of Albany, Georgia, 321 F. 2d 649 (5th Cir. 1963); Williams v. Wallace, 240 F.Supp. 100 (M.D.Ala. 1965).

there has never been any suspicion concerning them or their associations. It was not contended by the Attorney General, nor could it have been contended, that information from an anonymous and unverifiable source is probable cause for the search of a home.

Instances have often come to the attention of courts in which persons accused of crime have sought to prevent the use against them of illegally seized incriminating evidence. But it is only in the rare instance that a person not accused or even suspected of any crime petitions the court for redress of police invasion of his home. The reason is not that such invasions do not occur but, as Mr. Justice Jackson eloquently put it:

"Only occasional and more flagrant abuses come to the attention of the courts, and then only those where the search and seizure yields incriminating evidence and the defendant is at least sufficiently compromised to be indicted. If the officers raid a home, an office, or stop and search an automobile but find nothing incriminating, this invasion of the personal liberty of the innocent too often finds no practical redress. There may be, and I am convinced that there are, many unlawful searches of homes and automobiles of innocent people which turn up nothing incriminating, in which no arrest is made, about which courts do nothing, and about which we never hear.

" * * * There is no opportunity for injunction or appeal to disinterested intervention. The citizen's choice is quietly to submit to whatever the officers undertake or to resist at risk of arrest or immediate violence." Brinegar v. United States, 338 U.S. 160, 181–182, 69 S.Ct. 1302, 1314, 93 L.Ed. 1879 (1949) (Mr. Justice Jackson dissenting).

There can be little doubt that actions for money damages would not suffice to repair the injury suffered by the victims of the police searches. Neither the personal assets of policemen nor the nominal bonds they furnish afford genuine hope of redress. Nor is there any provision for compensation from public funds. In any event the wrongs inflicted are not readily measurable in terms of dollars and cents. Indeed, the Supreme Court itself has already declared that the prospect of pecuniary redress for the harm suffered is "worthless and futile." Moreover, the lesson of experience is that the remote possibility of money damages serves as no deterrent to future police invasions. Mapp v. State of Ohio, 367 U.S. 643, 651–652, 81 S.Ct. 1684, 3 L.Ed.2d 1081 (1961), and concurring opinion of Mr. Justice Douglas at 666, 670, 81 S.Ct. at 1698, 1699; Irvine v. People of State of California, 347 U.S. 128, 137, 74 S.Ct. 381, 98 L.Ed. 561 (1954); Wolf v. People of State of Colorado, 338 U.S. 25, 41, 42–44, 69 S.Ct. 1359, 93 L.Ed. 1782 (1949) (Mr. Justice Murphy dissenting).

The appellants' position has been lucidly articulated by their attorneys:

"Unless equity courts find means to protect the innocent homeowners, who are the principal beneficiaries of the Fourth Amendment, their rights will not be protected. It would be a grotesque irony if our courts protect only against the unlawful search which actually uncovers contraband (by the exclusionary rule), while offering no relief against an admittedly unlawful pattern and practice affecting hundreds of innocent homeowners." Brief of Appellants, p. 38.

We are persuaded that the injunction should issue even though the Veney raids have ceased and notwithstanding the Police Commissioner's General Order No. 10388. These raids were not isolated instances undertaken by individual police officers. They were rather the effectuation of a plan conceived by high ranking officials. All members of the Police Department, from the Commissioner down to the raw recruit, are expected to be familiar with the principle that if the police intend to conduct a search of a

man's home for a suspect, they must at least have probable cause to believe that he is on the premises. The doctrine is not subtle; it touches the very heart of law enforcement practices, and has found expression in numerous judicial opinions.[6] Its force could not have escaped the Commissioner and other members of the police hierarchy, yet the raids were carried on relentlessly for 19 days. The grave character of the department's conduct places a strong obligation on the court to make sure that similar conduct will not recur. Police protestations of repentance and reform timed to anticipate or to blunt the force of a lawsuit offer insufficient assurance that similar raids will not ensue when another aggravated crime occurs. See United States v. W. T. Grant Co., 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); Bailey v. Patterson, 323 F.2d 201, 205–206 (5th Cir. 1963); Anderson v. City of Albany, Georgia, 321 F.2d 649, 656–657 (5th Cir. 1963); "Developments in the Law—Injunctions," 78 Harv.L.Rev. 994, 1076 (1965). In fact, it is perhaps more reasonable to view the cessation of the raids and the promulgation of General Order No. 10388 not as belated acts of repentance but as the recognition of the futility of continuing the searches when it had become manifest that the Veneys had made their escape. They were later apprehended in New York State.

The General Order, in reciting no more than that probable cause is required to conduct a search, is in no sense a recognition that the conduct complained of fell short of established legal standards; it adds nothing to the general rule with which the rank-and-file policeman should already have been familiar. It is too vague to provide even a faint warning that searches based only on anonymous tips do not constitute proper police tactics. It would not have been too much to expect in these circumstances a forthright statement that officers conducting such illegal searches in the future will subject themselves to disciplinary action.

The plaintiffs, in their argument in the District Court maintained that the police behavior was racially discriminatory since most of the homes searched were occupied by Negroes. This contention the District Court rejected, reasoning that the police concentrated on Negro residences because the Veneys are Negroes and most of the information received related to their supposed presence in Negro neighborhoods. While this ruling of the District Court is not contested on appeal, we think that it has a substantial bearing on the question of whether injunctive relief is appropriate. The District Judge himself noted that "[t]he evidence does show what has become common knowledge in Baltimore—that the relations between the Negro community and the police have deteriorated seriously." 240 F.Supp. at 556 n. 4.

Baltimore City has escaped thus far the agony and brutality of the riots experienced in New York City, Los Angeles, Chicago, and other urban centers. Courts cannot shut their eyes to events that have been widely publicized through-

---

6. See Costello v. United States, 298 F.2d 99 (9th Cir. 1962); Wrightson v. United States, 95 U.S.App.D.C. 390, 222 F.2d 556 (D.C.Cir. 1955); Contee v. United States, 94 U.S.D.C. 297, 215 F.2d 324, 327 (1954); United States v. Ruffner, 51 F. 2d 579 (D.Md.1931). See also Aguilar v. State of Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); Giordenello v. United States, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958); Draper v. United States, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Even a cursory reading of the Fourth Amendment will not fail to convey the idea that an essential requirement before police may enter a private home is the existence of probable cause:

"The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

out the nation and the world. Lack of respect for the police is conceded to be one of the factors generating violent outbursts in Negro communities. The invasions so graphically depicted in this case "could" happen in prosperous suburban neighborhoods, but the innocent victims know only that wholesale raids do not happen elsewhere and did happen to them. Understandably they feel that such illegal treatment is reserved for those elements who the police believe cannot or will not challenge them. It is of the highest importance to community morale that the courts shall give firm and effective reassurance, especially to those who feel that they have been harassed by reason of their color or their poverty.

After so vast a demonstration of disregard of private rights, the complainants are entitled to a clear response. While the immediate pressure of wholesale raids has been withdrawn, the practice of indiscriminate searches of homes has been renounced only obliquely, if at all, and the danger of repetition has not been removed. The sense of impending crisis in police-community relations persists, and nothing would so directly ameliorate it as a judicial decree forbidding the practices complained of.[7]

In ordering the issuance of an injunction we have not blotted from our consideration the serious problems faced by the law enforcement officer in his daily work. His training stresses the techniques of the prevention of crime and the apprehension of criminals, and what seems to him to be the logical and practical means to solve a crime or to arrest a suspect may turn out to be a deprivation of another's constitutional rights. And where one policeman is killed and another wounded, the police, and the public, too, are understandably outraged and impatient with any obstacle in the search for the murderer. While fully appreciating the exceedingly difficult task of the policeman, a court must not be deterred from protecting rights secured to all by the Constitution.

The police department is society's instrumentality to maintain law and order, and to be fully effective it must have public confidence and cooperation. Confidence can exist only if it is generally recognized that the department uses its enforcement procedures with integrity and zeal, according to law and without resort to oppressive measures. Law observance by the police cannot be divorced from law enforcement. When official conduct feeds a sense of injustice, raises barriers between the department and segments of the community, and breeds disrespect for the law, the difficulties of law enforcement are multiplied.[8]

---

7. In the debate over the tentative draft of the American Law Institute's Model Code of Pre-Arraignment Procedure, Judge George C. Edwards, now a member of the United States Court of Appeals for the Sixth Circuit and formerly Commissioner of Police in Detroit, made the same point, that police excesses bear the seed of untoward counter reactions of violence. See 34 U.S.L.Week. 2641, 2642 (May 24, 1966).

8. The classic words of Mr. Justice Brandeis, dissenting in Olmstead v. United States, 277 U.S. 438, 485, 48 S.Ct. 564, 575, 72 L.Ed. 944 (1928), apply with full force in the present context:
"Decency, security and liberty alike demand that government officials shall be subjected to the same rules of conduct that are commands to the citizen. In a government of laws, existence of the government will be imperilled if it fails to observe the law scrupulously. Our Government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the Government becomes a lawbreaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy. To declare that in the administration of the criminal law the end justifies the means— to declare that the government may commit crimes in order to secure the conviction of a private criminal—would bring terrible retribution. Against that pernicious doctrine this court should resolutely set its face."

Baltimore now has a new Interim Police Commissioner whose enlightened efforts to foster better relations between the Negro community and the Police Department have been widely applauded by all elements of the community. The clear assurance which the injunction is designed to give is nevertheless still necessary in the interest of public tranquility. The issuance of the injunction will not prove harmful, but helpful, to the Interim Commissioner temporarily in office and to his successors in the lawful and effective exercise of their authority and in the administration of the department.[9]

The appellants, however, would have us go further. They urge this court to order an injunction much broader in scope than one limited to prohibiting searches based only on anonymous tips and without probable cause. They contend that the determination of the existence of probable cause should not be left to policemen but should be vested in a judicial officer, and that absent exceptional circumstances the police should be required to obtain a search warrant from a magistrate before entering the private home of a stranger in search of an offender, even when the police have in their possession a warrant for the arrest of the person they are seeking. Appellants point out that the existence of an arrest warrant establishes only that there is probable cause for the arrest of the person named therein, but that it reflects no judgment at all as to where the suspect may be found.

It is settled law, of course, that subject to established exceptions, a search warrant is constitutionally required to enable the police to conduct a search for "things." Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925). Appellants' contention is that there is no reason to think that police are better judges of probable cause when their quarry is a person rather than a thing. Moreover, appellants' counsel forcefully argue that from the standpoint of the victim the invasion of the privacy of his home is unaffected by the object of the policeman's search.

9. Though not stressed, the fact was mentioned in oral argument that since the preparation of the briefs the defendant named in the District Court proceeding has retired from office and has been succeeded by General George M. Gelston, as Interim Police Commissioner, whose successor is to be appointed in the near future. This presents no difficulty. Our concern is not with the person who happens to hold the office at a particular time, but with the office. The named defendant is only a nominal party, and the real aim of the proceeding is not to reach the Commissioner individually but to forbid an evil practice that has long and notoriously persisted in the Police Department. The ancient common law rule of abatement as a result of death or resignation of a public officer was relaxed and generally abandoned even before the 1961 amendment to Rule 25(d) of the Federal Rules of Civil Procedure. Seven Oaks, Inc. v. Federal Housing Administration, 171 F.2d 947, 950 (4th Cir. 1948). The Rule now provides:

"(d) Public Officers; Death or Separation from Office.

"(1) When a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and his successor is automatically substituted as a party. Proceedings following the substitution shall be in the name of the substituted party, but any misnomer not affecting the substantial rights of the parties shall be disregarded. An order of substitution may be entered at any time, but the omission to enter such an order shall not affect the substitution.

"(2) When a public officer sues or is sued in his official capacity, he may be described as a party by his official title rather than by name; but the court may require his name to be added."

The injunctive order may be issued against "The Police Commissioner of Baltimore City," or the name of the present incumbent may, on application and in the discretion of the District Court, be substituted. In either case the order will be binding in the future regardless of the identity of the office holder. See generally 2 Barron & Holtzoff, Federal Practice and Procedure (Wright ed. 1961), §§ 625 and 626.

The gravity of the invasion is precisely the same whether the policeman's objective is to search for a person or for an inanimate object, and the resulting injury is not mitigated by the fact that the officer may have a warrant to arrest some person but has not bothered to obtain a warrant from a judicial officer to search specified premises—not the premises of the person named in the arrest warrant. The contention is that the determination of probable cause for searching a particular home for a suspect who does not live there is the function of the magistrate, not the policeman.

Appellants frankly concede that no case explicitly upholds their contention, but they refer us to a few cases which may be construed as supporting their reasoning. See Morrison v. United States, 104 U.S.App.D.C. 352, 262 F.2d 449 (1958); District of Columbia v. Little, 85 U.S.App.D.C. 242, 178 F.2d 13, 17, 13 A.L.R.2d 954 (1949), aff'd. 339 U.S. 1 (1950). They criticize as inadequately and incorrectly reasoned the contrary statements in Love v. United States, 170 F.2d 32 (4th Cir. 1948), cert. denied, 336 U.S. 912, 69 S.Ct. 601, 93 L.Ed. 1076 (1949).

We have no occasion now to accept or reject the legal theory thus advanced by the appellants or to canvass countervailing arguments. The injunction which we order fully protects them and all similarly circumstanced from future violations of the character described in this record, and we find it unnecessary to consider the advisability of a broader decree.

The case will be remanded for the entry of a decree enjoining the Police Department from conducting a search of any private house to effect the arrest of any person not known to reside therein, whether with or without an arrest warrant, where the belief that the person is on the premises is based only on an anonymous tip and hence without probable cause.

Reversed and remanded.