**Rhoda BARTON and Lewis Johnstone, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**Eli EICHELBERGER, Mayor, City of York, Pennsylvania; Leslie Jackson, Director of Public Safety, City of York, Pennsylvania; Leonard Landis, Chief of Police, City of York, Pennsylvania; Russell Koontz, Captain, York City Police Department, City of York, Pennsylvania, Defendants.**

No. 69–286 Civil.

United States District Court,
M. D. Pennsylvania.

March 31, 1970.

McNees, Wallace & Nurick, Harrisburg, Pa., Peter Hearn, Edith Laver, Philadelphia, Pa., for plaintiffs.

Richard P. Noll, York, Pa., John W. Heller, III, City Solicitor, York, Pa., for defendants.

Louis Adler, Harrisburg, Pa., Jack Greenberg, James M. Nabrit, III, Michael Meltsner, Melvyn Zarr, New York City, Anthony G. Amsterdam, Stanford University Law School, Stanford, Calif., for amici curiae—NAACP Legal Defense and Educational Fund, Inc. and National Office for Rights of the Indigent.

## OPINION

NEALON, District Judge.

In this class action pursuant to Fed.R. Civ.P. 23(b) (2), declaratory and injunctive relief is sought by plaintiffs against the Mayor, Director of Public Safety, and certain named police officials of the City of York, Pennsylvania. Jurisdiction is premised upon 28 U.S.C. § 1343 (3) and (4) and 42 U.S.C. § 1983, the Civil Rights Act. Plaintiffs' complaint is bottomed on three basic issues, viz., that defendants, their agents, employees and all those acting in concert with them or at their direction violated the rights of plaintiffs and members of the class (a) by conducting unreasonable searches and seizures, in violation of the Fourth and Fourteenth Amendments of the United States Constitution; (b) by the use of excessive force and the imposition by them of summary punishment, in violation of the Due Process Clause of the Fourteenth Amendment, and (c) by authorizing or allowing illegal police tactics to be used primarily in black communi-

ties or against black people. Hearings were held August 6, 7, 8, 14; September 17; October 8 and 9, 1969, and a personal view of the area was made by the Court and counsel on August 6, 1969. After 1346 pages of testimony were transcribed, oral arguments were heard December 19, 1969, and the record finally closed on February 5, 1970, when defense counsel filed with the Court a copy of new police regulations adopted in the City of York.[1]

After reviewing all of the evidence, exhibits and briefs filed, I make the following

## FINDINGS OF FACT

1. The City of York, Pennsylvania, according to the 1960 census, has a population of 54,504, of which approximately 10% are members of the Negro race.

2. Over the past several years, there have been outbreaks of racial strife in York and on October 23, 1968, in an effort to combat future outbursts " * * * as a result of mob action or other civil disobedience * * * ", the York City Council enacted an ordinance empowering the Mayor to declare an emergency and to impose a curfew for 48 hours, which curfew could be extended beyond 48 hours by a resolution of Council.

3. On Thursday, July 17, 1969, and at all times material to the factual issues involved in this proceeding, defendant John L. Snyder was Mayor of the City of York,[2] defendant Jacob Hose was Director of Public Safety, defendant Leonard Landis was Chief of Police, and defendant Russell Koontz was Captain of the York City Police Department.[3] There are 94 members of the York Police Department, 6 of whom are Negroes.

4. On Thursday, July 17, 1969, a Negro juvenile was treated at the York Hospital for facial burns and he informed the police that he had been in the East section of the City when a group of white youths, known as the Girard Street Gang, threw flaming liquid in his face. He later recanted this story to the police, stating that he had burned himself while playing with lighter fluid, but the rumor of the original incident had spread throughout the City. It was this incident that allegedly set into motion the tragic series of disorders that follow.

5. The five main areas of disorder were: (1) the intersection of South Penn Street and West College Avenue in the Southwest quadrant of the City, hereinafter identified as Penn-College; (2) Penn Commons, a park in the Southwest quadrant, bounded by West College Avenue, Lafayette Street, Lindbergh Avenue and South Pershing Avenue, approximately two blocks East of the intersection of Penn and College, hereinafter identified as Penn Commons; (3) the juncture of Cottage Hill Road and North Newberry Street near the railroad tracks in the Northwest quadrant, approximately six blocks North of the intersection of Penn and College, hereinafter identified as Cottage Hill; (4) the Parkway Homes Project in the Northwest quadrant, approximately one mile North of the intersection of Penn and College, hereinafter identified as Parkway Homes, and (5) the immediate vicinity of the intersection of South Queen Street and East Maple Street in the Southeast quadrant, approximately seven blocks East of the intersection of Penn and College, hereinafter identified as Queen-Maple.

1. One of the prayers for relief requested " * * * this Court to order the named defendants to promulgate, after comment by counsel for plaintiffs and approval by the Court, written regulations governing the actions of individual policemen and to institute procedures for enforcing those regulations."

2. Mayor Snyder died October 8, 1969, and on January 15, 1970, Eli Eichelberger, the present Mayor of York, was substituted for him as defendant. In addition, Leslie Jackson, the present Director of Public Safety, was substituted for Jacob Hose.

3. Captain Rice of the Pennsylvania State Police was originally joined as a party defendant, but a motion to dismiss the action as to him was granted at the conclusion of plaintiffs' case in chief.

6. On Thursday, July 17, 1969, at 11:-00 P.M., an altercation between Negro and white juveniles broke out at Newberry Street and Cottage Hill Road, which is a predominately white area. (Cottage Hill)

7. On Thursday, July 17, 1969, at approximately 11:00 P.M., twelve Negro youths were observed throwing rocks at windows at the intersection of Newberry and Gay Streets. (Cottage Hill)

8. On Thursday, July 17, 1969, at 11:-40 P.M., two Negro youths, Takani Sweeney and John Washington, were shot and wounded at the intersection of North Pershing Avenue and West Philadelphia Street.[4] (Cottage Hill)

9. On Friday, July 18, 1969, shortly after 12:10 A.M., rifle fire erupted, and the throwing of rocks and bricks commenced, in the area surrounding the intersection of Penn and College in the Southwest quadrant of the City. A night of terror followed and continued until dawn. Persons were observed carrying rifles, running and hiding, and shots were heard throughout the night. It is this intersection, admittedly located in the Negro ghetto area, where repeated acts of violence occurred and where most of the searches of homes took place, as will be more fully explained hereafter.

10. In the early morning hours of Friday, July 18, 1969, at 12:45 A.M., a windshield in an automobile owned by a Mr. Doug Bredbenner (white)[5] was shattered with rifle shot at the corner of Newberry Street and the railroad tracks. (Cottage Hill)

11. On Friday, July 18, 1969, at 1:05 A.M., unknown youths threw rocks through the windows of homes of Mrs. Helen Miller and Mrs. Annie Poff in the 300 block of Smyser Street. (Cottage Hill)

12. On Friday, July 18, 1969, at 2:30 A.M., Dolores Sipe (Negro), while getting into a cab on Salem Avenue, one block West of the intersection of Penn and College, was shot twice in the back. (Penn-College)

13. On Friday, July 18, 1969, at 2:50 A.M., a Buick automobile containing a group of Negroes pulled alongside and shot into a vehicle being driven by John Smith (white) in the 500 block of West Princess Street. (Penn-College)

14. On Friday, July 18, 1969, at 3:30 A.M., Negro youths threw rocks through a window at Detweiler's Auction at 480 Salem Avenue.

15. On Friday, July 18, 1969, at 3:45 A.M., Negro youths threw pieces of concrete through a window at the Louis Foust home in the 500 block of Salem Avenue.

16. On Friday, July 18, 1969, at 4:15 A.M., at the intersection of Penn and College, an automobile being driven by Mrs. Madelyn Bowman (white) was shot at and she was struck in the head with a brick, fracturing her jaw. (Penn-College)

17. On Friday, July 18, 1969, at 4:40 A.M., at the intersection of Penn and College, Mr. Paul Ludwig was accosted in his car and struck in the face with a brick. (Penn-College)

18. On Friday, July 18, 1969, at 5:00 A.M., at the intersection of Penn and College, a vehicle being operated by Mr. John B. Messinger was struck with rocks and bricks. (Penn-College)

19. On Friday, July 18, 1969, at 5:00 A.M., at the intersection of Penn and College, a pickup truck being driven by John Detweiler was hit with bricks. (Penn-College)

20. On Friday, July 18, 1969, at 5:00 A.M., at the intersection of Penn and College, an object was thrown at a passing car in which four whites were seated and one of the occupants fired a rifle shot and struck Mr. Rodney Brown (Negro),

---

4. The alleged assailant, Robert Messersmith (white) has been found guilty of aggravated assault and battery arising out of this incident in the York County Court.

5. The race of most of the persons involved was not disclosed by the evidence, but where such designation was made, it is noted here.

who was standing at the intersection. (Penn-College)

21. On Friday, July 18, 1969, at 5:05 A.M., at the intersection of Penn and College, a brick was thrown through the window of a car being driven by Mr. Leroy Fray. (Penn-College)

22. On Friday, July 18, 1969, at 5:10 A.M., at the intersection of Penn and College, a stationwagon operated by Mr. Martin Lehr was struck with a brick while proceeding through the intersection. (Penn-College)

23. On Friday, July 18, 1969, at 5:20 A.M., at the intersection of Penn and College, an automobile driven by Mr. Chris Spinelli (white) was hit with bricks and fired upon by unidentified Negroes. (Penn-College)

24. On Friday, July 18, 1969, at 5:20 A.M., at the intersection of Penn and College, a motor vehicle driven by Dean Coffman was struck and damaged. (Penn-College)

25. On Friday, July 18, 1969, at 5:20 A.M., at the intersection of Penn and College, a brick was thrown through the windshield of a vehicle being driven by Josephine Guiffrida. (Penn-College)

26. On Friday, July 18, 1969, at 5:30 A.M., at the intersection of Penn and College, the right rear window of the automobile being driven by Thomas McCaulsin was shot out while proceeding through the intersection. (Penn-College)

27. On Friday, July 18, 1969, at 5:30 A.M., at the intersection of Penn and College, three rifle shots were fired into the Edgar Leber car. (Penn-College)

28. On Friday, July 18, 1969, at 5:30 A.M., at the intersection of Penn and College, a brick was thrown and three shots fired into a vehicle being operated by Larry Witmer. (Penn-College)

29. On Friday, July 18, 1969, at the intersection of Penn and College, the left front and right rear windows were broken in the automobile of Esther Mae Klindinst by unknown assailants. (Penn-College)

30. On Friday, July 18, 1969, at 5:40 A.M., at the intersection of Princess and College, the front window of a Rambler automobile driven by Mary Wolf was smashed with stones. Princess Street is one block to the North of and runs parallel to College Avenue. (Penn-College)

31. On Friday, July 18, 1969, at 6:45 A.M., two Molotov cocktails were thrown at the G. F. Plitt and Son garage door at 523 Cooper Avenue.

32. On Friday morning, July 18, 1969, exact time unknown, a hole was shot in the window of a building owned by Sophie Timmerman at 424 East Philadelphia Street in the Northeast quadrant.

33. In the early morning of Friday, July 18, 1969, exact time unknown, Negro men with guns were seen on porches in the 100 and 200 blocks of South Newberry Street. (Penn-College)

34. On Friday evening, July 18, 1969, at 6:30 P.M., a firebomb was thrown into a building owned by Edward Hoffman at 931 West King Street.

35. On Friday evening, July 18, 1969, at 7:45 P.M., a fire was set at the home of Alice Stough, 206 North Beaver. (Parkway Homes)

36. On Friday, July 18, 1969, at 9:25 P.M., front windows were broken in a business place owned by Harry Butzel at 564 North Pershing. (Parkway Homes)

37. During the evening of Friday, July 18, 1969, two armored vehicles owned by the York Police Department and identified as "Bonny" and "Big Al" were assigned to patrol the area near the Penn and College intersection. (Penn-College)

38. On Friday, July 18, 1969, at 10:20 P.M., a windshield in a vehicle owned by Kenneth Kauffman was shot out while moving toward the west end of the West Princess Street Bridge, approximately two blocks from the intersection of Penn and College. (Penn-College)

39. On Friday, July 18, 1969, at 10:30 P.M., a window was broken in the C. H. Arnies garage and $2.00 was taken. The garage is at 339 East Cottage Place

and four white youths were observed in the area. (Queen-Maple)

40. On Friday, July 18, 1969, at 10:30 P.M., the armored truck "Big Al" was dispatched to the 300 block of West Hope Lane to assist the firemen in extinguishing a mattress fire and heard gunfire from the intersection of Penn and College, approximately one block away in a southwesterly direction. (Penn-College)

41. On Friday, July 18, 1969, at 11:00 P.M., Officer George Palmer observed two Negro youths with a rifle and pistol at the intersection of Green Street and College Avenue, one block from the intersection of Penn and College. (Green Street is immediately West of Penn Street and consists of only one block, the 200 block.) (Penn-College)

42. On Friday, July 18, 1969, at 11:10 P.M., Stanford Gilbert was shot and seriously wounded while seated on his motorcycle at the intersection of College and Pershing, approximately two blocks from the intersection of Penn and College. While policemen were assisting him and attempting to place him in an ambulance, they were fired upon from three corners of the intersection. (Penn-College)

43. On Friday, July 18, 1969, at 11:10 P.M., the armored vehicle "Big Al" was dispatched to the intersection of Pershing and College to assist the wounded motorcyclist and as the vehicle passed the intersection of Penn and College, five Negro males and one white male were observed at the intersection. While proceeding East on College Avenue toward Pershing and College, and while on the College Avenue Bridge, several rifle shots struck the vehicle and Officer Henry Schaad was shot and sustained wounds from which he ultimately died on August 1, 1969. (Penn-College)

44. On Friday, July 18, 1969, before Midnight, at the intersection of Penn and Princess, one block from the intersection of Penn and College, a Negro male was wounded and was taken to the hospital by Richard Noll, Esq., who was in the area assisting the police. (Penn-College)

45. On Saturday, July 19, 1969, at 12:30 A.M., at the intersection of Penn and College, the tires and rear window were shot out of a Ford sedan being operated by Sarah E. Miller by three Negro males armed with rifles. (Penn-College)

46. On Saturday, July 19, 1969, at 12:30 A.M., in the 200 block of Green Street, two Negro males, Clarence Ausby and Bennie Carter, were shot and wounded by police fire. (Penn-College)

47. On Saturday, July 19, 1969, at 8:15 A.M., a firebomb was thrown against a building at 434 South Queen Street. (Queen-Maple)

48. During the night of July 18 and the early morning of July 19, the York Hospital reports indicated the following emergency treatment: Dennis Keefer for a small wound of the left side of his back, but the location of the shooting was unknown; Dale Witmyer for wounds of the chest, location of shooting unknown; Calvin Sims for wounds in back of head received when he was shot at 12:41 A.M. at the intersection of Penn and College; Norman Lehr shot in the left side at 12:35 A.M. while going East on College Avenue, approximately one block from Penn and College; Nelson Lushman for cuts on left hand received at 12:35 A.M. at Grantley and College, approximately two blocks from Penn and College; James Needham for wounds of right leg when shot at 2:45 A.M. in his back yard at 155 South Newberry Street, approximately two blocks from Penn and College.

49. On Saturday, July 19, 1969, Mayor Snyder declared a state of emergency and imposed a curfew from 9:00 P.M. to 6:00 A.M. for all persons under 21, and from 10:00 P.M. to 6:00 A.M. for all persons over 21.

50. On Saturday, July 19, 1969, at 6:00 P.M., Charles Harris was fired upon by a group of white men at the intersection of North Newberry and Market in the Northwest quadrant. (Cottage Hill)

51. On Saturday, July 19, 1969, at 8:03 P.M., at the intersection of Gay and Newberry Streets, a stone was thrown at

a passing car operated by Russell Wantz. (Cottage Hill)

52. On Saturday, July 19, 1969, at 9:-10 P.M., near the intersection of George and Market Streets, John Charity, a Negro, was arrested for curfew violation.

53. On Saturday, July 19, 1969, at 9:30 P.M., shots were fired into the home of Betty Rice located at 533 Thomas Street.

54. On Saturday, July 19, 1969, at 10:00 P.M., a Mercury automobile being operated by Ralph Hamilton, a California resident, was shot at and damaged at the intersection of Lincoln Drive and Beaver Street. (Parkway Homes)

55. On Saturday, July 19, 1969, at 11:45 P.M., Lionel Bailey, since June 2, 1969, a Director of the Community Progress Council, an anti-poverty organization sponsored by the Office of Economic Opportunity; Greland Holmes and Willie Harris were arrested for curfew violation. Racial slurs and threats were directed at Bailey by Police Officers at the time of arrest and later at the Police Station. They were ultimately acquitted of violation of curfew when it was determined that they had permission to undertake a peace keeping mission in the Penn and College area until 10:30 P.M.

56. On Saturday, July 19, 1969, at 10:30 P.M., on South George Street near College Avenue, a car being driven by Susan Strayer was fired upon by two Negro males and Miss Strayer was wounded in the left knee. (Penn Commons)

57. On Saturday, July 19, 1969, at 11:00 P.M., a Pennsylvania State Trooper, Dale Allen, was wounded in the left arm while operating a State Police vehicle at Parkway Boulevard and Front Street. Officer John Provenza, an occupant in the vehicle, was cut by flying glass. Rifle shooting continued in this area for approximately two hours. (Parkway Homes)

58. On Saturday, July 19, 1969, at 11:10 P.M., rifle shots were fired into the home of Richard Shaeffer at 447 South George Street, by persons unknown. (Queen-Maple)

59. On Saturday, July 19, 1969, prior to Midnight, a 1961 Plymouth vehicle operated on North George Street by Dennis Stouch was shot at and the rear tires punctured. (Parkway Homes)

60. On Sunday, July 20, 1969, at 9:00 A.M., a 1968 Ford truck operated by Burnell Tome was fired upon at the intersection of Grantley and College. (Penn-College)

61. On Sunday, July 20, 1969, at 2:45 P.M., at the intersection of Lindbergh and Lafayette near Penn Park rifle shots were fired at an automobile driven by James Podgett, striking the rear window, and he, in turn, struck a parked car in attempting to get away. (Penn Commons)

62. On Sunday, July 20, 1969, at 3:-05 P.M., at the intersection of Newberry and Gay Streets, a 1966 Buick driven by William Grant was struck with bricks and rocks. (Cottage Hill)

63. On Sunday, July 20, 1969, at 7:30 P.M., a White Power meeting was held in Fahquar Park and while police were attempting to disband the crowd, Officer Charles Robinson was heard to shout "White Power".

64. On Sunday, July 20, 1969, at York City Hall, Sgt. Nevin Barley remarked to fellow officers that he "had two shotgun shells for Lionel Bailey".

65. On Sunday, July 20, 1969, 32 Pennsylvania State Policemen from Troop H were assigned to the City to assist the York Police Force.

66. On Sunday, July 20, 1969, at 6:45 P.M., shots were fired into a home at 344 West College Avenue wounding an occupant, Reginald Ellis, who was sitting on a sofa. (Penn-College)

67. On Sunday, July 20, 1969, at 8:00 P.M., three persons—Jeanette Register (Negro), age 8; Daryl Register (Negro), age 3, and Mrs. Patricia Ebersole (white) —were shot and wounded by police fire while standing at a wire fence near the

Housing Project located on South New-berry Street. (Penn-College)

68. On Sunday, July 20, 1969, at 9:00 P.M., at the intersection of Princess and Penn, a vehicle operated by James Ziegler was struck in the tires and rear window by rifle shots and Mr. Ziegler abandoned the vehicle at this location. (Penn-College)

69. On Sunday, July 20, 1969, at 9:15 P.M., at the intersection of North New-berry Street with the railroad tracks, a 1968 Cadillac operated by Mrs. Ernestine Rankin was shot at and damaged. (Cottage Hill)

70. On Sunday, July 20, 1969, at 9:30 P.M., at Newberry and Cottage Hill Road, a rifle shot was fired through the windshield of a 1954 Cadillac being operated by Mitchell Edwards. (Cottage Hill)

71. On Sunday, July 20, 1969, at 9:30 P.M., on College Avenue Bridge, a 1969 Thunderbird, driven by James Bevender, was struck by rifle fire on the left side. (Penn-College)

72. On Sunday, July 20, 1969, at 9:30 P.M., William Wright was shot and wounded in the abdomen while standing in the vicinity of College and Penn. (Penn-College)

73. On Sunday, July 20, 1969, at 9:30 P.M., in the 100 block of South Newberry Street, Gary Richards was shot in the scalp, shoulder and hand. (Penn-College)

74. On Sunday, July 20, 1969, at 9:40 P.M., at the corner of Hamilton and Pershing Parking Lot, a 1956 Cadillac, while being chased by police, turned into the parking lot where it struck four cars. (Parkway Homes)

75. On Sunday, July 20, 1969, at 9:55 P.M., at the intersection of Duke and East Cottage, a brick was thrown into a 1966 Oldsmobile automobile being driven by Donald P. Kelly. (Queen-Maple)

76. On Sunday, July 20, 1969, at 9:55 P.M., a group of approximately 30 white teenagers, including members of the Newberry Street Boys, were observed on the bridge adjacent to the 200 block of Cottage Hill Road chanting "We're White" when a police car came by and over the public address system attached to the car warned the group that they had five minutes to disperse and then the police car pulled away. (Cottage Hill)

77. On Sunday, July 20, 1969, at 10:00 P.M., on South Duke Street, a 1963 Ford truck operated by Kenneth Brown was damaged by rifle fire (Queen-Maple)

78. On Sunday, July 20, 1969, shortly after 10:00 P.M., Clifton Kohler (white), 286 Cottage Hill Road, reported to City Hall that a member of the White group assembled at the bridge had threatened to firebomb his home and Kohler was told by the person answering the telephone, "What are we supposed to do about it?" Mr. Kohler's residence was in a row house adjoining that of a Negro couple, Mr. and Mrs. Frank Meyers, who were the only Negroes living in the neighborhood. Thirty minutes later the Kohler and Meyers homes were struck with a firebomb and then riddled with gunfire. These incidents were reported to the police by Mr. Kohler, but he was told that there was nothing that could be done about it. Later in the morning further shots were fired and Mrs. Meyers was cut by flying glass. (Cottage Hill)

79. On Sunday, July 20, 1969, at 10:30 P.M., at the York Hospital parking garage, the windows were shot out of a 1964 Corvair owned by Eugene Spangler.

80. On Sunday, July 20, 1969, at approximately 11:00 P.M., at 23 East South Street, three rifle shots were fired into a 1950 Dodge owned by Byrd Markel. (Penn Commons)

81. On Sunday, July 20, 1969, at 11:30 P.M., in the 700 block of South Queen Street, a group of Negroes shot and damaged a 1962 Chevrolet being driven by Gerald Inkrote. (Queen-Maple)

82. On Monday, July 21, 1969, at 5:10 A.M., the vehicle abandoned the previous night by Mr. James Ziegler at Princess and Penn was saturated with

gasoline and destroyed by fire. (Penn-College)

83. On Monday, July 21, 1969, at 5:15 A.M., at the intersection of Penn and College, the windows of an automobile driven by Mr. B. Geesey were broken after being struck by bricks. (Penn-College)

84. On Monday, July 21, 1969, at 12:20 P.M., Mr. Harvey S. Hess, while driving a 1962 Chevrolet through the intersection of College and Penn, was attacked by a group of approximately twelve Negroes, who struck him on the shoulder with the barrel of a shotgun broke the front and rear windows, and escaped with a bugle from his car. (Penn-College)

85. On Monday, July 21, 1969, additional State Police from Lancaster and Reading were assigned to assist the York Police.

86. On Monday, July 21, 1969, at 5:15 P.M., at the intersection of College and Penn, Mr. Paul Bupp was attacked and beaten with an umbrella by two Negro men. (Penn-College)

87. On Monday, July 21, 1969, at 9:00 P.M., at the intersection of North Newberry and Gay Streets, Mrs. Lillie Belle Allen (Negro) was shot in the chest by sniper fire and sustained wounds from which she later died. Rev. James Mosley, also a Negro and occupant of the car with Mrs. Allen, was struck and injured by glass when the sniper fire hit the vehicle. (Cottage Hill)

88. On Monday, July 21, 1969, at 9:30 P.M., at 647 Princess Street, bricks were thrown into the living room of the residence of Mr. Earl Garlinger.

89. On Monday, July 21, 1969, at 9:50 P.M., at the intersection of East College and South Duke, two shots were fired at a truck being driven by Mr. Robert Sweitzer. (Penn Commons)

90. On Monday, July 21, 1969, at 9:50 P.M., at South Queen Street near Maple, bricks were thrown at a 1962 Mustang being operated by Fredericka Comad, damaging the right front door, right front fender and convertible top. (Queen-Maple)

91. On Monday, July 21, 1969, at 9:55 P.M., at the intersection of South Queen Street and East South Street, a 1968 Plymouth operated by Mr. H. Kessey was struck with bricks and the windshield smashed. (Queen-Maple)

92. On Monday, July 21, 1969, in the vicinity of Maple and Duke Streets, a predominantly Negro residential area, between the hours of 10:00 P.M. and 11:00 P.M., a substantial amount of gunfire erupted. At the intersection of Jackson and Duke, approximately three blocks from the Maple and Duke intersection, three police officers were pinned down by rifle fire and were unable to get back into their police cruiser car. This area was then flooded with policemen, who required the assistance of an armored truck in order to extricate the besieged policemen. In the 400 block of South Queen Street, one block from the intersection of Maple and Duke, twenty stations and then shot out the street to thirty Negro youths wrecked two gas light. A police armored truck investigated and received 10 to 15 rounds of rifle fire from the middle of Maple Street. Later a police armored truck came to the intersection of Maple and Queen and fired 50 to 75 rounds westerly on Maple Street. Still later, the fire engine housed in the 300 block of South George Street was subjected to heavy gunfire and the Fire Chief ordered the Firemen out of the building and, with the assistance of the police, the fire equipment was also removed. (Queen-Maple)

93. On Monday, July 21, 1969, immediately prior to Midnight, three rifle shots were fired in front of the home of Harold Carr at 189 Parkway Boulevard. (Parkway Homes)

94. At approximately Midnight on Monday, July 21, 1969, four houses were reported to be on fire on West Hope Lane, located on South Penn between College and Princess. Firemen could not get to the fire because of heavy gunfire

directed at them from the intersection of Penn and Princess. Approximately 75 black residents formed a line in front of the fire engines and, marching abreast, led the Firemen to the scene of the fire. When the fire was extinguished, the Firemen, preparing to leave, were shot at once again from the Penn and Princess intersection. (Penn-College)

95. On Tuesday, July 22, 1969, at 1:25 A.M., at Pershing and College Avenue, an armored police vehicle fired into Penn Commons Park. (Penn Commons)

96. On Tuesday, July 22, 1969, at 2:05 A.M., Governor Raymond Shafer, acting on the request of York officials, declared a state of emergency and assigned units of the Pennsylvania National Guard to the City of York.

97. On Tuesday, July 22, 1969, at 3:00 A.M., shots were fired into the home of Robert Simpson at 212 Green Street. (Penn-College)

98. On Tuesday, July 22, 1969, in the early morning hours, men were seen carrying guns into a house in the 500 block of McDonald Lane.

99. On Tuesday, July 22, 1969, in the early morning hours, one shot was fired through the outside wall of the home of Clara Murray, 342 Stone Avenue.

100. On Tuesday, July 22, 1969, early A.M., James Spills, 453 West Princess, was injured by flying glass. (Penn-College)

101. On Tuesday, July 22, 1969, at 12:06 P.M., at the intersection of Queen and Maple, an automobile driven by Richard Kimmel was struck in the left front fender by rifle fire. (Queen-Maple)

102. On Tuesday, July 22, 1969, at 12:50 P.M., at the intersection of Penn and College, a group of 30 to 40 youths attacked a 1962 Chevrolet car being operated by Paul S. Belalman with bricks, knives and clubs, damaging the front window and left side door. (Penn-College)

103. On Tuesday, July 22, 1969, at 12:55 P.M., near the intersection of Penn and College, bricks were thrown at a 1969 Ford truck being operated by Mr. Jacob Albert. (Penn-College)

104. On Tuesday, July 22, 1969, at 1:08 P.M., at the intersection of Penn and College, two bricks struck a 1963 Ford truck driven by Mr. H. P. Phiel. (Penn-College)

105. On Tuesday, July 22, 1969, at 1:15 P.M., at the intersection of Penn and College, a dump truck driven by Richard Traux was struck with unidentified objects and the windshield and mirror were damaged. (Penn-College)

106. On Tuesday, July 22, 1969, the curfew was amended by the Mayor to provide that all persons except those going to and coming from place of employment; representatives of the press, police, fire and hospital personnel, were to remain off the streets from the hours of 8:00 P.M. to 6:00 A.M. The proclamation was extended for a further period of 48 hours by the York City Council on July 23, 1969.

107. On Tuesday, July 22, 1969, at 3:35 P.M., at the intersection of Lindbergh and College, three shots were fired at an automobile driven by Mary Louise King, and these shots were believed to have come from Penn Commons.

108. On Tuesday, July 22, 1969, at 3:40 P.M., at the intersection of Penn and College, Fritz Heede, a motorcyclist, was shot in the right side of the chest and seriously wounded. (Penn-College)

109. On Tuesday, July 22, 1969, at 5:00 P.M., two shots were fired into the home of Mrs. Helen Smith, 136 Jefferson Avenue, shattering the window and damaging a wall. (Parkway Homes)

110. On Tuesday, July 22, 1969, at 9:00 P.M., at Pershing Boulevard and North Beaver Street, two Negro males fired rifle shots at a vehicle operated by Isaac Young. (Parkway Homes)

111. On Wednesday, July 23, 1969, at 12:30 A.M., at the intersection of Market

and Hartley, an automobile driven by Adam Mickley (white) was ordered to stop and back-up by police officers and, while backing-up, the vehicle was fired at 8 to 10 times and Mr. Mickley was wounded.

112. On Wednesday, July 23, 1969, at 2:30 P.M., rifle fire was reported in the vicinity of West Cottage Place.

113. On Wednesday, July 23, 1969, at 3:30 P.M., a resident reported hearing rifle shots in the 600 block of Cleveland.

114. On Wednesday, July 23, 1969, at 4:15 P.M., two rifle shots were fired in the area between King and Market.

115. On Wednesday, July 23, 1969, at 4:30 P.M., rifle shots were heard in the Kurtz Avenue area.

116. On Wednesday, July 23, 1969, at 5:30 P.M., Mr. Richard Weaver and Mr. Russell Lloyd reported to the police that they observed boys with shotguns on North Beaver Street at the Parkway. (Parkway Homes)

117. On Wednesday, July 23, 1969, at 8:00 P.M., armed with search warrants, the City Police, accompanied by State Police and National Guardsmen, searched residences located at 202, 208, 254, 255 and 300 South Penn Street, in the vicinity of the intersection of College and Penn. (Penn-College)

118. On Wednesday, July 23, 1969, at 11:00 P.M., Lester Jiles (Negro) was stopped and searched by police and National Guard at Penn and College, and was verbally abused with racial slurs by a member of the National Guard unit. He did not have the required pass on his person. Later, at City Hall, he was subjected to racial slurs by the police.

119. On Thursday, July 24, 1969, Henry Hall was shot in the buttocks in the 400 block of East King Street.

120. On Thursday, July 24, 1969, at 7:30 P.M., a rifle shot rang out in the Jefferson School area. (Parkway Homes)

121. On Thursday, July 24, 1969, at 8:00 P.M., police conducted searches of homes at 618 North Beaver Street, 153 Willis Lane, 208 North Newberry, and 229 North Newberry. The search of the residence at 618 North Beaver Street was the only one conducted without a search warrant. (Parkway Homes and Cottage Hill)

122. On Friday, July 25, 1969, by proclamation of the Mayor, the curfew was amended and limited so that it would be in force from 11:00 P.M. to 6:00 A.M. for a period of 48 hours.

123. On Sunday, July 27, 1969, at 12:25 P.M., a rifle shot was reported in the 600 block of Jessup Place.

124. On Sunday, July 27, 1969, at 7:00 P.M., a rock was thrown through the window of a home at 212 Liberty Court and an automobile parked in front of the home was also damaged.

125. On Monday, July 28, 1969, the curfew expired.

126. On Wednesday, July 30, 1969, in the late evening, near the intersection of Market and Maple, a reporter, Michael Cronin, was assaulted by a group of white youths.

127. On Friday, August 15, 1969, early A.M., police observed two youths throw a bottle through a store window and gave chase with police dogs and apprehended the youths, identified as Jerry Orr and Henry Hall, Negroes.

128. On October 28, 1969, in York County Court, Jerry Orr entered a plea of guilty to the charge of Malicious Mischief emanating from the August 15th arrest.

129. During the emergency period from July 17 to July 28, York police made 108 arrests for offenses connected with the disorders. Of those arrested, 59 were Negroes and 49 were whites.

## DISCUSSION OF FACTS

It scarcely needs stating that not every rifle shot, act of vandalism and violence, and public disturbance were officially reported, or testified to, so that these findings represent only a portion of the wave of horror and panic that gripped the City of York during this 10-day period. There were references to general

gunfire throughout the night, roving gangs with weapons, scattered attempts at firebombings and small children running with armed adults. Police vehicles were subjected to heavy fire while patrolling the troubled areas. Even a cursory perusal of the Findings of Fact points up the enormity of the problem with which law enforcement officials were confronted during this period.

Out of this mélange of shocking bloodletting, plaintiffs have extracted 17 separate occurrences as forming the factual foundation upon which their claim for relief is constructed.

There is no need to burden this Opinion with a detailed analysis of each of plaintiffs' factual contentions as many of them are worthy of only brief comment, as follows:

(a) The testimony of former Officer Elmer Woodyard relative to police treatment of black residents at Maple and Duke Streets in August, 1968, was given in explanation of a suspension he received for allegedly not performing his duties at that time. To my surprise, it is now being advanced by plaintiffs as evidence of police brutality. It will not be so considered because it was not received as substantive evidence; it is vague and incomplete and it is far too remote in time to be of importance here.

(b) Helen Miller's charges against the York Police Force are twofold: (1) the rejection of Officer Willy Dinges of her complaint that she observed white youths throwing stones at Negroes in passing cars, and (2) the refusal of the police to investigate when she reported that, although she didn't see the persons who threw rocks through her windows, she recognized the voice of a person she knew only by the name of "Sonny". According to her, the police refused to investigate the rock-throwing incident because her boyfriend is a Negro, but there is nothing to suggest that the policeman who received the telephone call was aware of this relationship. While any refusal to check on a complaint of this type is inexcusable, there is no competent proof

that it was motivated by an anti-Negro attitude.

(c) The accusation by Charles Harris that on Saturday, July 19, the police cooperated with a white gang, even to the point of supplying weapons, is rejected in its entirety. Mr. Harris peculiarly enough lives at 301 West College Avenue, at the intersection of Penn and College, the scene of greatest turbulence. While he may have been the object of gunfire from white youths, I do not accept his claim of police participation.

(d) The professed beating and sadistic manhandling of John Charity is as bizarre as it is incredible. His story is so interlaced with untruths, deceit, and scandalous falsehoods that it can be accepted only to the extent that it establishes his arrest and that, while in custody, he required medical treatment. His recollection of events was changed conveniently so many times that it would require a puerile approach to the ascertainment of truth to rely confidently on any portion of his testimony. His statement on the witness stand that during the taping of his questioning by the District Attorney the desired answers were whispered to him by a State Policeman and two York Police Officers borders on the absurd. I observed him closely during the trial and must conclude that he demonstrated utter contempt for the truth. I reject all of his uncorroborated testimony and it is so untrustworthy and treacherous that it does not warrant any further comment and analysis.

(e) The assertion that physical abuse was visited upon Henry Hannible and Benjamin Nolden on Sunday, July 20, was not contradicted by the police officers who made the arrests. Captain McCaffrey and Lt. Wasser testified concerning this happening, but neither was present when the arrests were first made and the mistreatment occurred. Although Hannible testified that he and Nolden proceeded down this road to the Ice House because they saw a police car and thought someone was hurt, I believe

his story is suspect for several reasons: (1) his actual residence was approximately two miles from the scene; (2) the road to the Ice House terminated in a dead end, and (3) this was a sensitive area where, less than 24 hours previously, a policeman had been shot by snipers. Nevertheless suspicious circumstances notwithstanding, absent an explanation from the police involved, the abusive treatment was unwarranted and inexcusable.

(f) The only testimony relative to reckless police firing into Penn Commons came from Mr. James N. Snavely, a reporter for the York Gazette and Daily, who stated that he observed a police armored car fire two or three shots into the Commons at 1:25 A.M., July 22, when the Park was empty. Police officials complained that this witness is not objective and has a penchant and inordinate alertness for police error and this may be demonstrated by his statement that, upon seeing this, he directed his sister to make a notation of the exact time it occurred so that he could " * * * check it out later." [6] He predicated his determination that the Park was empty on his experience that while sitting on the porch every evening he noticed " * * * about 6:00 o'clock every evening for some unknown reason, the park was barren of anyone * * *" and on the night in question he had been sitting on the porch " * * * for at least an hour and a half before, and there was nothing in the park."

It should be noted that from 9:50 P.M. to Midnight that very night, numerous violent incidents were reported in the Penn Commons neighborhood ranging from the abandoning of the Fire House in the 300 block of South George Street (one short block from the easterly boundary of Penn Commons) to the extensive fusillade of firearms reported at East Maple and South Duke and East Maple and South Queen. The event complained of here is too hazy and inconclusive to warrant a separate finding of police recklessness.

(g) The Robert Simpson incident cannot be traced to any police activity. Mr. Simpson's testimony did not identify the source of the shooting, but merely opined that he " * * * heard a truck coming up the Street." This evidence was received only after plaintiffs' counsel assured the Court that a " * * * Mr. Williams will testify that the police were the source of the shots." Contrary to this representation, Mr. Williams was never produced and the promised identification never came about.

(h) The confrontation between the Police and Lester Jiles on July 23, at 11:00 P.M., is significant in this case only to the extent that he was berated and ill-treated by York Police at the Police Station. Several factors dilute the weight of his testimony in other respects, viz., although allegedly enroute to his place of employment, Borg-Warner Company, he was on the street after curfew without the required permit on his person; he was stopped at the intersection of Penn and College less than three hours after the search of homes in that area produced a cache of weapons and ammunition, and the abuse at the scene of his arrest was attributed by him to National Guardsmen and not to York City Police.

(i) The relevancy of the Michael Cronin incident on July 30, has not been satisfactorily established. According to plaintiffs' witness Fred Flickinger, he heard the attacking youths shout "there is that Gazette reporter—(1)et's get him * * *", but he didn't know who they were or whether they were members of a white racist gang. It is true that one Officer Brown told him that Cronin "deserved" the beating and the next time they " * * * should do a better

6. Mr. Snavely admits the relationship between the Police and his newspaper "is not wholesome"; that there "has been sniping from both ends", and that some of his stories have not been complimentary to the Police Department, such as his taking a picture "when cops slept * * *".

job * * * ", but it is pure speculation to conclude that the assault was winked-at by the police because of some alliance with the so-called Newberry Street Boys.

(j) The apprehension and arrests of Jerry Orr and Henry Hall, some two weeks after the emergency had ended, brings into play the question of the propriety of the use of police dogs. There is no testimony that the dogs were used during the critical period, viz., July 17 to July 27, so that the relevance of this evidence to the issues at bar is highly questionable. Moreover, the propriety of the arrests has been confirmed, in part, by the plea of guilty entered by Orr to the crime for which he was being pursued by members of the York Canine Corps. Consequently, it appears that plaintiffs offered evidence on the use of police dogs to show the employment of excessive, uncontrolled force by police officials. Plaintiffs' evidence is that Hall and Orr were running away from the scene (a bottle had been thrown through a store display window) when the officers released two dogs to give chase. While being apprehended, Hall was only bitten slightly, but Orr was bitten to the extent that he required hospital treatment. According to plaintiffs, the bitings were ordered by the policemen in control of the dogs. The policemen, however, contended that without the dogs they could not have captured the suspects, short of shooting, and that Orr was bitten by the dog because, after being caught initially, he made a further attempt to run away. Moreover, according to the police, the dogs are trained to grab and hold a suspect and that was all the force that was used on this occasion. As to the utilization of dogs generally, Lt. H. Stephen Gibbs, Commander of the Canine Division, testified that there are eleven dogs in the division and they are used primarily for crowd control. Since the inception of the division in 1962, 24 persons, including 14 Negroes, have sustained dog bites. In the year 1968, the Canine Division participated in the investigation of 258 fights and disorderly conduct, 26 bur-glaries, 4 robberies, 27 muggings, 37 prowlers, 9 trackings of fugitives, and 62 episodes of crowd control. Each dog is assigned to a specific policeman and is quartered at the policeman's home. Their use is determined solely by Lt. Gibbs, the Officer in charge. He contends that they have unusual preventive potential and cited instances where riots and mob activity ceased promptly when the dogs were brought into view. He also pointed out specific examples where the dogs had been used successfully in tracking an armed killer, as well as locating lost children. As to crowd control, he testified that gang fights were brought to a halt without injury to anyone because dogs were deployed, whereas many were injured when the police attempted to restrain the participants. Viewed in the over-all light of dog usage by the police, the incident with Orr and Hall, even if true, does not reveal a pattern of impermissible usage. Moreover, I am satisfied that their use in the manner hereinabove referred to was proper and justifiable.

The remaining episodes require more detailed comment and are listed seriatim.

## I

### Ausby-Carter Shooting

It is only fair to point out that the first reported incident occurred July 17, at 11:00 P.M., after which more than 25 turbulent hours passed, consisting of scores of acts of violence, without one alleged incident of police repression or misconduct. The first complaint centers around the wounding of Clarence Ausby and Bennie Carter, both Negroes, on Saturday, July 19, at approximately 12:30 A.M. At this time, the police witnesses contend that the armored vehicle "Big Al", occupied by Sgt. Nevin C. Barley, Officer Ronald McCoy, Officer Provenza, Officer Heist and Officer Tortorici, was proceeding West on College Avenue and at the intersection of Penn and College, three or four Negro males were observed running West on College Avenue toward the intersection of Green Street. Pursuing these individ-

uals, the vehicle turned South on Green Street when it was fired upon from a building on the Northeast corner of the intersection of College and Green and the police officers in the vehicle returned the fire. The vehicle then moved West on College Avenue in order to provide cover for other police officers who were pinned down in a parking lot near the Southwesterly corner of the Green and College intersection when the right window on the passenger side was struck with a rifle shot and glass was sprayed on the occupants. The vehicle then pulled into a parking lot on the South side of College Avenue and radioed City Hall for more ammunition and for assistance from the armored vehicle "Bonny". Because of wounds received from the shattered glass, Officer McCoy was removed from the armored vehicle and transported by police car to City Hall. "Big Al" then proceeded West on College to Grantley Avenue where additional ammunition was received and then proceeded North on Grantley and remained in that vicinity. In the meantime, upon receiving the message for assistance from "Big Al", the armored vehicle "Bonny" proceeded West on Princess Street and made a lefthand turn and proceeded South on Green Street toward the intersection of Green and College when it was subjected to rifle fire. As "Bonny" approached the intersection and was preparing to make a righthand turn to go West on Green Street, a Negro male came out from one of the buildings on the West side of Green Street and fired at the police vehicle. Fire was returned and the Negro male fell to the ground and was dragged away by two companions who came to assist him. "Bonny", while still being exposed to rifle fire, then moved out of the area. Shortly thereafter "Big Al", in response to a call, proceeded to Green Street (Green Street is only one block long and runs between College and Princess) to render assistance to an injured man. The Officers informed the Negro residents at the scene that the injured man would have to be brought and placed in the vehicle as the Officers would not leave the vehicle. One of the wounded men, Clarence Ausby, was placed in the vehicle by Negro residents and the police transported him to the intersection of West College and Grantley Avenue, some two blocks away, where he was placed in a police ambulance and taken to the hospital. Mr. Carter was taken to the hospital by neighbors in a private vehicle, where he remained for five days.

The plaintiffs' version of this happening is decidedly different from defendants'. According to plaintiffs, Mr. and Mrs. Bennie Carter, Mr. and Mrs. Jerome Carter, and another neighbor were sitting on Carter's front steps, talking and drinking beer, since 8:00 P.M. that evening. At about 10:00 P.M. they were joined by another neighbor, Mr. Clarence Ausby. It was a warm night and although shots could be heard from surrounding areas, there had been no shots fired on Green Street. (As noted before, Green Street consists of only one block between West College and West Princess Avenues, running parallel with the 200 block of South Penn Street, and the Carter home was slightly more than one block from the Penn and College intersection.) At approximately 12:30 A.M., an armored vehicle appeared at the intersection of West College Avenue and Green Street; someone in the vehicle shouted, "Okay, you black bastards, if that's the way you want it, you're going to get it * * *", whereupon a continuous volley of shots rang out from the vehicle, spraying Green Street and sending those on Carter's porch scrambling for cover. Mr. Ausby was shot three times in his right thigh and lay helpless by his car, parked at the curb, and called out to Mr. Carter, "Dodo, I am hit." Mr. Carter crawled out and pulled Ausby toward his house when he also was shot in the back. Mr. Ausby was taken into the Carter kitchen and a call for help was made to City Hall. Subsequently, in response to the call, an armored vehicle pulled up in front of the house and while shouting racial epithets, someone

in the truck stated, "If you want him to go to the hospital, you put him in the truck because we are not coming out there with all you niggers there." Neighbors then put Ausby into the truck, but the police would not allow anyone to accompany him to the hospital. While in the truck, Ausby testified that he was kicked and treatened and then transferred to an ambulance which transported him to the hospital, where he remained thirteen days.

It is difficult to reconcile such diametrically opposed recollections of what actually occurred. Several factors must be considered in evaluating the testimony of each side. It should not be overlooked that the tragic shooting of Officer Schaad had taken place barely more than one hour before the Green Street calamity and this was the first return of the armored vehicle "Big Al", in which Officer Schaad was riding when shot, to the scene of the shooting. Moreover, Sgt. Nevin Barley, who was described in the testimony as a strong-willed individual with anti-Negro feelings, had just been assigned to, and placed in charge of "Big Al". So that plaintiffs' argument that the Officers in "Big Al" were emotionally upset and disturbed over the Schaad shooting which motivated the purported wanton and reckless shooting on Green Street merits careful consideration. On the other hand, plaintiffs' version that there was no shooting on Green Street prior to the action of the police vehicle and that none of the police fire was provoked, must be evaluated in the light of the testimony of Officer Palmer (a neighbor of Carter and a Negro), that he observed two armed Negro youths at the intersection of College and Green at 11:00 P.M., and the further fact that, at the hospital, unexpended 22 caliber shells were found in Mr. Ausby's pocket. However, I was particularly impressed by the testimony of Mrs. Rose Belle Washington, who lives at 232 Green Street, across the street from the Carter residence. Mrs. Washington was sitting on her porch since 8:00 P.M. and observed the Carters and Ausby on the Carter porch. She noticed the armored vehicle pull into the intersection and severe shooting erupted from this vehicle. She backed into her home and then the shooting " * * * stopped for about 10 or 15 minutes and *then it started up again.*" According to the witness, "*This time * * * (t)hey were still firing and I heard someone say, 'I am shot,' across the street." (Each emphasis supplied) She then saw Mr. Carter " * * * trying to take him (Ausby) in his house after he got shot." Shortly after, an armored vehicle arrived in front of the Carter home and racial vulgarities were called out by the occupants of the truck. Mr. Ausby was then placed in the truck and taken to the hospital.

If Mrs. Washington's sequence of events is correct, then it could be permissibly concluded that the vehicle "Big Al" encountered rifle fire on West College Avenue between South Penn and Green Streets and then upon reaching the intersection of West College and Green, the occupants shouted the threats described and fired indiscriminately down Green Street and then moved West on College Avenue to give cover to beleaguered policemen at the corner of West College and Hartley Street where, once again, the vehicle was struck by rifle fire. "Big Al" picked up ammunition at West College and Grantley and then moved North on Grantley toward West Princess. During this lull on Green Street, "Bonny" was responding to the call to assist "Big Al" and while proceeding down Green Street, an armed Negro came to the curb and shot at "Bonny". Fire was returned and the assailant was shot and fell to the ground, from which point he was dragged away by others. Not being able to locate the wounded man, "Bonny" moved out in answer to a call for assistance for a heart attack victim on West Philadelphia Street. Subsequently, "Big Al" was ordered into Green Street to assist a wounded man and, as a result, Mr. Ausby was taken to the hospital.

The reasonable inference, therefore, is that Mr. Ausby and Mr. Carter were wounded by fire from "Bonny". Admittedly, this does not totally resolve the conflict in evidence, but I am satisfied that this is as close as a fact finder can come to rationally reconstructing the general picture considering the hysteria then existing.

## II

### Arrest of Lionel Bailey

It became obvious during the course of the testimony that Lionel Bailey is viewed in a different manner by members of the black community than he is by members of the Police Department. He is a spokesman for the blacks, giving voice to their long-standing complaints, and is the driving force behind those who instituted this action. He testified expressively of their grievances against the City Officials, in general, and the Police Force, in particular, although conceding " * * * that basically the Police Department of York was a halfway decent police department." It is equally apparent from the evidence that many police officers regard him as an instigator and a troublemaker. It may be that they are possessed of information justifying this attitude; however, there is absolutely no competent evidence in the record linking him with the unlawful and outrageous activities of certain groups of the black community which are spelled out in more detail in the Findings of Fact. Consequently, to the fact finder, any police antagonism towards him appears to be entirely unwarranted. Its significance for the purposes of this lawsuit will be discussed later.

## III

### White Power Meeting

The only testimony concerning this phase of plaintiffs' case came from Fred Flickinger, an acknowledged · former member of the Newberry Street Boys, a loosely-organized white racist group. He stated that he had seen policemen, while driving by in police cars, raise their clenched right fists in a "White power" salute on at least 25 occasions. This type of testimony, unaccompanied by identification of the offenders, is incapable of refutation. However, Mr. Flickinger also testified that he attended meetings of several white gangs at Fahquar Park on Sunday, July 20, at 3:00 P.M. and 7:30 P.M. At the latter meeting, according to the witness, a York Police Officer, Charles Robinson, shouted the slogan "White Power" and the crowd started cheering. There were other Officers on duty at the time, but none were heard to make similar remarks. This conduct by a Police Officer, considering the frenzied state of emotions prevailing at that time, was outrageous and reprehensible. Officer Robinson was not called as a witness to deny this accusation and, hence, it will be accepted as true.

## IV

### The Register-Ebersole Shootings

The West College Avenue Bridge is located in the 200 block of West College Avenue and spans the Codorus Creek and the railroad tracks. The westerly end of the bridge leads to the intersection of West College with the 200 and 300 blocks of South Newberry Street, while the easterly end leads to the intersection of West College with the 200 and 300 blocks of South Pershing Avenue. At the easterly end of the bridge and south of West College Avenue, an Ice House is located, and directly across Codorus Creek in the 300 block of South Newberry Street, stands a housing project. About 7:30 P.M., Sunday, July 20, while it was still daylight, five York Police Officers were at the Ice House location in the process of placing two Negro males, Henry Hannible and Benjamin Nolden, under arrest. Across the creek there was an embankment approximately thirty feet higher than the ground level at the Ice House and, on top of this embankment, there was a high, wire fence at the housing project. A large amount of shrubbery, vines and

weeds had grown around, and on, the fence, substantially concealing it from view from the other side of the creek. A group of 15 to 20 adults and children had gathered at the fence watching the police at the Ice House. Suddenly the police were fired upon from three separate locations, viz., from the opposite (westerly) side of the creek approximately 300 yards away in the direction of the housing project; from under the bridge 100 yards North of where they were standing, and from three Negro youths standing on the bridge itself. In all, twelve shots were fired at the police and they returned a total of 60 to 70 rounds to all three positions. One of the policemen was observed pointing in the direction of the embankment and was heard to cry out "There they are. Get them." As the shots rang out, the group at the wire fence scattered and ran towards the housing project. Regrettably, three of those running were struck with bullets and wounded: Mrs. Patricia Ebersole (white), Jeanette Register (Negro and 8 years old), and her three-year-old brother, Daryl Register. All were taken to the hospital, where the Register children remained for seven days, while Mrs. Ebersole was treated and released. The policemen admit that shots were fired by them into the weeds at the foot of the embankment " * * * where we were shot from * * * ", but insist that, at no time, were any people seen at the fence on the top of the embankment, presumably because of the heavy foliage entwining the fence. I realize that it is awkward, after the excitement and anxiety of the event has passed, to sit in sober and detached judgment, far removed from the fear of physical danger, and weigh the actions of policemen during a moment of crisis requiring a split-second reaction. Neither the lawyers, nor the Judge, were exposed to the intense rifle fire that greeted the policemen when they responded to calls for help and assistance. While judgment is difficult, an objective appraisal justifies the conclusion that, considering the time of day the awareness of the location of the housing project and the danger involved, the police retaliation was rash and excessive.

### V

### *The Kohler-Meyers Incident*

The importance of the testimony on this point, according to plaintiffs, is its showing that York Police allowed white gang members to congregate without being broken up and failed to respond to the telephone calls for help from the Kohler family. (The Kohlers, white, lived in a row house connected to that of Mr. and Mrs. Meyers, black, and the assaults were undoubtedly directed against the Meyers family, who were the only Negroes in the neighborhood. The Meyers did not testify.) Insofar as this police conduct supposedly reflected a deliberate plan, or indifferent attitude, to the plight of these families, it is emphatically rejected. Although the Kohlers most certainly had good cause for alarm and frustration, especially with the response received to their telephone calls, fault for what followed cannot be fairly laid at the door of the Police Department. Mr. Kohler conceded that when the police car was on the bridge, the white youths did not display any firearms or firebombs. The viciousness and callousness of the attacks by whites on the home of this unsuspecting Negro family shows a wicked and depraved mentality. But, as the Findings of Fact will disclose, as darkness fell that evening, shootings and acts of arson and violence burst out in several sections of this troubled City and continued throughout the night. Cruiser cars patrolled the Cottage Hill area as best they could and, while patrolling, were endangered by gunfire in the Gas Company storage area, near the Kohler home. At 2:30 A.M., police officers went to the Meyers' home and inquired of Mr. Meyers and were told everything was all right, although later that morning, a further barrage of gunfire was directed at the Meyers home and Mrs. Meyers was cut by flying glass. Under the cir-

cumstances, the charges of police collaboration with the assailants and unwillingness to protect a Negro family are without substance.

## VI

### Queen-Maple

The accusation that police in an armored car, without provocation, fired into a black residential area near Queen and Maple Streets comes from a former Negro Police Officer, Elmer Woodyard, Jr. While I do not question his sincerity or integrity, his vantage point for observing that which he now condemns was his second-floor bedroom window, two houses removed from the intersection. He had the " * * * blinds down and the curtain off to one side" as he peered out the window. Admittedly, there had been numerous acts of destruction and great turmoil in the neighborhood. (See Findings of Fact 90, 91 and 92.) Mr. Woodyard described " * * * a lot of shooting up in that area that night * * * ", but maintained that the shooting had ceased for approximately one hour when an armored vehicle came up to the intersection of Queen and Maple, slowed down, and then unleashed a burst of 50 to 75 rounds West on Maple Street. When he was asked whether he knew if there was any activity taking place at that time on Maple Street, he responded:

> "At that time I was under the impression that there couldn't possibly have been anybody up there. It would have been foolish. I don't believe those people up there are idiots. You can hear an armored car coming, the city ones, for two blocks, if not more, and you know exactly what it is when it is coming up the street. I learned later that there was a barricade set up in front of the Crispus Attucks Center. This may have been what

they were firing at. I don't know." (N.T. 237, 238)

This is a slender reed, indeed, upon which to base a finding that there was no provocation for the shooting, especially in light of the witness' point of observation. The implication that the presence of an armored vehicle would cause those people discharging weapons to flee is misplaced in light of the testimony that, during the disorders, numerous shots were directed at, and struck, the armored vehicles, including the deplorable shooting of Officer Schaad. Mr. Woodyard's testimony is too speculative and uncertain and will not be accepted as proof of the fact sought to be established.

## VII

### Searches on July 23 and July 24

As hereinbefore noted, two of the primary sites of havoc and bloodshed were near the intersection of Penn and College[7] and the Parkway Homes Project.[8] Suffice it to say that Penn and College was practically impassable during the nighttime hours, the streets were barricaded, and it had literally become an armed camp. Recital of the woundings, vicious assaults, arson attempts, and property damage is unnecessary. In this emotionally charged atmosphere, search warrants were obtained from a Justice of the Peace on July 23 for premises described as 202, 208, 254, 255 and 300 South Penn Street. Plaintiffs assert that these searches violated the Fourth Amendment of the United States Constitution as they were not based on a sufficient showing of probable cause and were accompanied by an excessive show of force. The background leading up to the searches will be briefly set forth here. Culminating an agonizing series of shootings at the Penn and College intersection, on Tues-

---

7. See Findings of Fact 9, 12, 13, 18–30 inclusive, 33, 37, 38, 40–46 inclusive, 48, 60, 66–68 inclusive, 71–73 inclusive, 82–84 inclusive, 86, 94, 97, 100, 102–105 inclusive, and 108.

8. See Findings of Fact 35, 36, 54, 57, 59, 74, 93, 109, 110, 116 and 120.

day, July 22, at 3:30 P.M., in broad daylight, a motorcyclist named Fritz Heede was shot and seriously wounded as he was passing through the intersection. The following afternoon at 2:10 P.M., an unidentified informant stated to Lt. Wasser of the York Police Department that, on the previous day, she heard the shots when Mr. Heede was wounded; that she observed rifles and shotguns pointing out the windows of various houses in the 200 block of South Penn, and that she observed certain named persons entering and exiting from these premises with firearms. According to Lt. Wasser, he had known this informant for fifteen years; she was an outstanding citizen; she had given him confidential tips on six prior occasions, four of which were accurate and resulted in subsequent police action. At 6:00 P.M. that evening, Lt. Wasser, District Attorney John F. Rauhauser, Jr.; Detective Gerald Sweeney, and Mary Weaver, Secretary to the Director of Public Safety, went to the office of Alderman Forry,[9] where the applications for Search Warrants and accompanying affidavits were prepared and executed. After identifying the particular premises to be searched, and describing the items sought in the search as "unlicensed high-powered rifles; rifles, shotguns, automatic weapons, and similar weapons and the ammunition therefor * * *", the affidavit attached to each application stated:

"I was told on or about July 22, 1969, at or about 6:00 P.M. at City Hall, York, Pennsylvania, by an undisclosed informant, a person whom I believe to be reliable because that person's reputation for truthfulness in the community is highly regarded; that the description of the surroundings including broken windows, buildings, and persons were confirmed by me as being accurate and correct; that other information heretofore provided by said informant has been verified as being accurate and that the infor-mant's description of events corresponds to information obtained by me independently of the information provided by the informant; that the informant personally observed that on or about July 22, and July 23, 1969 at various times in the city of York, County of York, Pa., at the aforesaid premises, certain persons of the negro race including but not limited to the following were seen to have entered and exited from said premises with firearms of the above description and were seen to have held, pointed and fired said weapons from windows in said premises repeatedly at various persons and objects, said persons including: Lionel Bailey, Smickle Wright, Michael Wright, John Day and William Green.

"The following additional facts exist and are known to me and give me probable cause to believe that a search warrant as applied for should be issued, viz: one Fritz Heede, on July 22, 1969, was shot by rifle fire and was seriously wounded while driving his automobile at or near the aforesaid premises and from the circumstances it is reasonably believed that the shot came from the aforesaid location as one of a limited number of possible locations; that in the area where said premises are situated the illegal firing of guns has existed sporadically for several days and nights endangering the lives of citizens of this community."

Based on this information, Search Warrants were issued by the Alderman at 7:30 P.M. for the searches on South Penn Street. The time for the actual search was purposely fixed for 8:00 P.M., which was curfew time, so that no one would be on the street and there would be no interference with the public. Accompanied by some 50 National Guardsmen, State Police and York Police, the District Attorney went to the 200 block of South Penn Street; road blocks were set up sealing off the sur-

---

9. The Alderman's office was located three blocks from the Penn-College intersection.

rounding streets and, equipped with a portable speaker, Mr. Rauhauser identified himself and announced: "You are requested to remain off the street. You are asked to be calm. You are asked to cooperate. This is a limited search conducted by the City Police, the State Police with the National Guard. No one will be harmed. Please cooperate. Please observe the curfew and stay off the street." The homes named in the warrants were immediately searched by armed policemen and a substantial number of weapons and ammunition were confiscated. Under the riotous conditions then and there existing, the manner of the searches and the means employed were perfectly lawful and proper and require no elaboration. Plaintiffs' counsel and amici argue strenuously, however, that there was insufficient data to support a finding of probable cause for the Search Warrants.

The Supreme Court has recently reviewed its decisions on probable cause in Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), wherein the following are referred to as established propositions:

" * * * that only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause, Beck v. Ohio, 379 U.S. 89, 96, 85 S.Ct. 223, 228, 13 L.Ed.2d 142 (1964); that affidavits of probable cause are tested by much less rigorous standards than those governing the admissibility of evidence at trial, Mc-Cray v. Illinois, 386 U.S. 300, 311, 87 S.Ct. 1056, 1062, 18 L.Ed.2d 62 (1967); that in judging probable cause issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense, United States v. Ventresca, 300

U.S. 102, 108, 85 S.Ct. 741, 745, 13 L.Ed.2d 684 (1965); and that their determination of probable cause should be paid great deference by reviewing courts, Jones v. United States, 362 U.S. 257, 270–271, 80 S.Ct. 725, 735–736, 4 L.Ed.2d 697 (1960)." 393 U.S. at 419, 89 S.Ct. at 598.

In the Spinelli decision, the Court faced a situation somewhat similar to the one in the case at bar. There, in applying the probable cause standards of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), to an affidavit supporting a search warrant and containing an informant's tip, the Court concluded (1) that the affidavit was deficient in not setting forth any of the underlying circumstances necessary for the magistrate to judge the validity of the informant's tip; (2) that it was further deficient in not setting forth any reason to establish the credibility of the informant or the reliability of his information, and (3) that the other facts and circumstances attested to did not provide sufficient evidence of probable cause needed to support the search warrant. In this case, Lt. Wasser swore that his undisclosed informant personally observed certain individuals, five of whom were named, enter and leave five addresses on South Penn Street on two specified dates with firearms, and while there to have fired the weapons from the windows. This is sufficient to meet the underlying circumstances test. Lt. Wasser also swore in his affidavit that he believed his informant to be reliable because of that person's reputation for truthfulness in the community. Other than the latter, no facts as to the informant's credibility were sworn to.[10] There is, however, enough in the affidavit on the reliability

10. While Lt. Wasser testified that he orally informed the Alderman of his past successes based on the informant's tips, this is insufficient to support a specific finding of credibility since it was not part of the affidavit before the Alderman. The affidavit presented in support of a search warrant serves as the exclusive record for review of the Alderman's finding of prob-

able cause. United States v. Sterling, 369 F.2d 799, 802 n. 2 (3d Cir. 1966). Compare United States ex rel. Boyance v. Myers, 398 F.2d 896, 897 n. 1 (3d Cir. 1968), and see generally, Christofferson v. Washington, 393 U.S. 1090, 89 S.Ct. 855, 21 L.Ed.2d 783 (1969) (Brennan, J. dissenting).

of the information provided by the informant to meet the Aguilar test. For instance, Lt. Wasser swore that he personally verified the informant's tip as to the description, condition and residents of the area in question and that the informant's narration of events occurring at the residences enumerated corresponded to that obtained by his independent investigation. From these details the Alderman could reasonably infer that the information offered by the informant was reliable. Therefore, I conclude that the two-pronged test enunciated by Aguilar is met by the supporting affidavit of the Search Warrants for the residences on South Penn Street.

Moreover, I am satisfied that the other facts and circumstances attested to by Lt. Wasser in his affidavit sufficiently corroborate the informant's tip so that it could fairly be considered by the Alderman as trustworthy evidence of probable cause. Specifically, it was sworn to that on the day before one Fritz Heede was shot by rifle fire while driving at or near the premises sought to be searched. It was further sworn to that the illegal firing of guns had taken place sporadically for several days and nights in the area of the residences in question. Finally, the affidavit mentions, as hereinbefore cited, the fact that at least some independent police work was conducted at the general scene which resulted in a verification of the informant's description of the environs. All of the allegations leave no doubt in my mind that the supporting affidavit was sufficient to provide the basis for a finding of probable cause by the Alderman.[11] It does not significantly detract from the trustworthiness of the affidavit that the informant saw certain persons enter and leave the residences with firearms for the inference can rea-

sonably and fairly be drawn that the residences, used as sniper's nests, still contained some weapons and ammunition or at least some evidence of the illegal shootings.

Plaintiffs also challenge the Search Warrants issued by Alderman Forry on July 24, for premises at 153 Willis Lane, 208 North Newberry Street and 229 North Newberry Street, although it would appear that they are not pursuing their objections pertaining to the latter two as no evidence or argument was made concerning them.[12] Mention is made that the warrants were defective on their face, as the time noted on the warrants indicated they were issued 45 minutes before the affidavits were executed, but, after considering the evidence, I specifically hold that the time noted was a mistake and the warrants, in fact, were issued after the affidavits were executed and submitted. In addition, plaintiffs complain that the warrantless search of the premises at 618 North Beaver Street was constitutionally invalid.

Initially, plaintiffs claim that these searches were conducted with an unreasonable show of force is untenable. I have carefully reviewed the evidence on this point and conclude that, under the circumstances, the searches were conducted in a valid and appropriate manner.

With reference to plaintiffs' prime target, the search at 153 Willis Lane, the affidavit accompanying the application for a search warrant stated that the police were searching for weapons and ammunition; that one Curtis Tyler lived in a semidetached, two-story brick dwelling known and numbered as 153 Willis Lane, and

11. See generally, Note, Riot Control and the Fourth Amendment, 81 Harv.L.Rev. 625 (1968); Note, Riot Control: The Constitutional Limits of Search, Arrest and Fair Trial Procedure, 68 Colum.L. Rev. 85 (1968); Comment, The Long Hot Summer: A Legal View, 43 Notre Dame Law 913, 980–985 (1968).

12. The searches of 208 and 229 North Newberry Street, occupied by white residents, unearthed a supply of weapons and ammunition. The searches at 153 Willis Lane and 618 North Beaver Street did not uncover any firearms.

" * * * the following information gives me probable cause to believe the above facts, viz: I was told on or about July 24, 1969 at about 3:30 PM in the neighborhood where said premises are located by an undisclosed informant, a person who I believe to be reliable because I have known that person personally for about seven years and of my own personal knowledge and based upon the reputation for truthfulness of that person in the community where the informant lives, which informant advised me that said Curtis Tyler had in his possession at and about said premises in public sight a shotgun and a rifle; that said informant and other persons in the neighborhood, by observation saw said Curtis Tyler use said weapons to shoot public street lights and to have in his possession such weapons and to be at or near a State Police vehicle when a wind shield was shot out of said vehicle injuring a State policeman and a City policeman, which event occurred approximately 72 hours prior to receipt of this information."

█ As with Lt. Wasser's affidavits supporting the Search Warrants on South Penn Street, the principal attack of the plaintiffs is on the existence of probable cause for the search. Since an undisclosed informant is involved, the same principles enunciated by Spinelli and Aguilar and applied to the South Penn Street affidavits are pertinent. Here, the informant personally observed Curtis Tyler in possession of the weapons and personally observed him shoot public street lamps and saw him in the vicinity of a shooting involving State and City Policemen 72 hours previously. Thus, I find that the affidavit set forth sufficient underlying circumstances necessary for the Alderman to judge the validity of the informant's tip. With respect to the information in the affidavit as to the credibility of the informant or the reliability of the informant's information, Lt. Wasser swore that he believed the informant to be reliable upon his personal knowledge over a seven-year period and upon informant's reputation for truthfulness in the community. When the detailed information on Curtis Tyler provided by the informant is taken into consideration, sufficient evidence exists from which the Alderman could reasonably infer that the information given by the informant was reliable. Consequently, I find that the Aguilar standards were satisfied by the supporting affidavit of the Search Warrant for the Willis Lane residence.

Furthermore, the other facts and circumstances sworn to by Lt. Wasser sufficiently corroborate the informant's tip so that it could be fairly considered by the Alderman as trustworthy evidence of probable cause. The detail contained in the affidavit about Tyler's use of the weapons to shoot out public street lights and his possession of weapons in the vicinity of a specific shooting incident involving State and City Policemen convince me that the informant's tip was sufficient to provide the basis for a finding of probable cause by the Alderman.

█ The final grievance concerns the search of premises at 618 North Beaver Street, which was admittedly done without a warrant. This search occurred immediately after the search of premises at 153 Willis Lane, the residence of Curtis Tyler, where, according to the affidavit, the police expected to find weapons in the possession of Curtis Tyler. After finding that Tyler was not at home, police officials somehow determined that, at that moment, he was in the residence at 615 North Beaver Street, which is located "right around the corner" from 153 Willis Lane. I find that the warrantless search of 615 North Beaver Street was valid since exceptional circumstances were present requiring immediate entry of the premises before the time within which a warrant could have been obtained. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Jones v. United States, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514

(1958); Johnson v. United States, 333 U.S. 10, 14–45, 68 S.Ct. 367, 92 L.Ed. 436 (1948); Note, Riot Control and the Fourth Amendment, 81 Harv.L.Rev. 625 (1968); Note, Riot Control: The Constitutional Limits of Search, Arrest and Fair Trial Procedure, 69 ColumL.Rev. 85 (1968); Comment, The Long Hot Summer: A Legal View, 43 Notre Dame Law. 913, 980–985 (1968). There is no question here that probable cause existed for the search of Tyler's residence on Willis Lane. There is also no question that the police did not find the weapons they thought they would find in Tyler's residence. In light of the informant's report that Tyler had the firearms in his possession when seen, and in view of the fact that the police discovered no weapons at 153 Willis Lane, it was reasonable for the police to conclude that Tyler still had them in his possession. When it was then determined that Tyler was close by at 618 North Beaver Street, they were justified in their reasonable belief that an immediate search of these premises was necessary for the protection of themselves and the public. An examination of the discussion relative to the search at 153 Willis Lane and a review of the appropriate Findings of Fact illustrate the tense and dangerous situation which prevailed in and about 618 North Beaver Street. Even plaintiffs' witnesses testified that there had been shooting within an hour of the search in the nearby Jefferson School area. "The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others." Warden v. Hayden, 387 U.S. 294, 298, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). If the Officers had to leave this potentially explosive scene to prepare an application for a warrant and submit it to a magistrate, the very purpose of the proposed search would be frustrated—Curtis Tyler could get away, the weapons could be concealed or removed, and the danger sought to be eliminated would still remain. Accordingly, I conclude that the exigencies of the situation justified the warrantless search of 618 North Beaver Street.

Considering that a state of emergency had been declared by the Governor of Pennsylvania; that National Guardsmen and State Police occupied the City, and that curfews had been fixed, it is to the credit of York officials that they made every reasonable effort to comply with constitutional requirements under most strenuous conditions. In no event, however, does the record exhibit an official policy authorizing unconstitutional searches, as in Lankford v. Gelston, 364 F.2d 197 (4th Cir. 1966), which that Court described as " * * * the effectuation of a plan conceived by high ranking officials." 364 F.2d at 202.

Summarizing, therefore, the proven transgressions by the York Police Department during this terrifying period of violence are as follows:

(a) the indiscriminate shooting into Green Street by the police occupants of the armored vehicle "Big Al", accompanied by racial slurs and epithets;

(b) the rash and excessive shooting in the direction of the housing project resulting in the wounding of three persons;

(c) the police antagonism and racial taunting directed toward Lionel Bailey, a Negro spokesman in York;

(d) the physical manhandling and verbal insulting of Henry Hannible, Benjamin Nolden and Lester Jiles, and

(e) the "white power" utterances of members of the York Police Department, principally that of Officer Charles Robinson at a meeting in Fahquar Park on Sunday, July 20, 1969.

The racial name-calling alluded to here certainly demonstrates that some prejudice and antagonism exists among certain members of the York Police Department and did exist prior to the initial flare-up on July 17. But the hostility is not all one-sided, for Rev. Thomas E. Montouth, a retired Presbyterian Minister and a Negro, testified that he had

been present at public meetings where police officers were subjected to verbal abuse from young Negro men and that they deserved " * * * a great deal of credit for their reservation * * *" and " * * * took it very courageously." Circulars distributed during the disorders by black agitators repeatedly referred to the police as "pigs". Also, at the trial, Miss Mary C. Tyler, plaintiffs' witness and a Negro, rudely called defense counsel "a pig" in open Court and Robert Stokes, also a Negro, scornfully referred to three policemen as "studs". Although such attitudes are regrettable, it is pure folly to pretend that they do not exist. Any policeman worth his salt should make every effort to attempt to understand the emotions and feelings of minority groups and such groups, in turn, should appreciate the enormous problems connected with law enforcement. These difficulties have been recognized and reviewed in recent Governmental Reports.

"In society's day-to-day efforts to protect its citizens from the suffering, fear, and property loss produced by crime and the threat of crime, the policeman occupies the front line. It is he who directly confronts criminal situations, and it is to him that the public looks for personal safety. The freedom of Americans to walk their streets and be secure in their homes— in fact, to do what they want when they want—depends to a great extent on their policemen." Report by the President's Commission on Law Enforcement and Administration of Justice, "The Challenge of Crime in a Free Society", 92 (1967).

However, the power to maintain, uphold and enforce the law does not carry with it the right to exercise it arbitrarily, unreasonably or defiantly. Policemen must understand their true role in law enforcement and should not abuse it.[13]

"(T)o many Negroes, police have come to symbolize white power, white racism and white repression. And the fact is that many police do reflect and express these white attitudes. The atmosphere of hostility and cynicism is reinforced by a widespread perception among Negroes of the existence of police brutality and corruption and of a 'double standard' of justice and protection— one for Negroes and one for whites." Report of the National Advisory Commission on Civil Disorders, 93 (1968).

That policemen generally are subjected to undeserved verbal abuse and physical indignities from certain quarters cannot be denied and, no doubt, it provokes a desire to respond in kind. If all policemen acted with the fairness and impartiality that we like to expect of them and they were treated by all members of the community with the courtesy and respect to which they are entitled, then much trouble could be avoided. However, in the case before us, the contention is made by plaintiffs that the citizens of York are "systematically denied fair and humane treatment by the callous and flagrantly unlawful actions of their police force, actions which can have flourished only in the face of tolerance or willful failure to impose the necessary controls upon individuals on the force." Plaintiffs ask this Court to permanently restrain defendants, their agents, representatives, employees and all persons acting in concert with them from (1) searching premises based solely upon the statement of an unidentified informant; (2) encouraging acts of violence by some members of the York community against other members; (3) use of force against any York resident absent a threat of immediate harm to policemen or other members of the community; (4) authorizing or allowing excessive force in response to threats of bodily harm; (5) authorizing, allowing or engaging in verbal or physical abuse of any resident or against persons in police custody. To implement these requests, plaintiffs suggest several forms

13. For the views of a Legal Advisor to a major Police Department, see McBroom, "Enforcement of the Common Law Rules of Arrest: A Handcuffing of Police?", 6 Duquesne Univ.L.Rev. 363 (1968).

of relief, including (a) ordering the defendants to promulgate written regulations governing the actions of individual policemen and to institute procedures for enforcing those regulations; (b) ordering the defendants to investigate the activities of members of its force identified at the hearings and to institute whatever corrective measures found to be necessary; (c) the appointment of a Master to conduct hearings and make findings with respect to complaints from individual residents of York concerning police practices, and/or (d) the appointment of a Receiver to operate York's Police Department until self-corrective measures instituted by defendants take effect.

■ Relief by mandatory injunction is not regarded with judicial favor and is used only with caution and in cases of great necessity. A mandatory injunction, it is said, should be granted only under compelling circumstances. 42 Am. Jur.2d, Injunctions, § 20. Nevertheless, in appropriate circumstances, Federal injunctive relief may be necessary. See Hague v. C.I.O., 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); Lankford v. Gelston, supra; Note, The Federal Injunction as a Remedy for Unconstitutional Police Conduct, 78 Yale L.J. 143 (1968). I am satisfied that such extraordinary action is not warranted here.

■ Plaintiffs' contention that "(p)robably no Court in American history has heard evidence of a more shocking display of police racism and excessive force than has been presented in the seven days of testimony here * * *" does not survive the test of objective evaluation. It cannot be disputed that an emergency situation existed in York, where the entire citizenry was subjected to merciless and vicious attacks by blacks and whites alike. In the first 24 hours, there were numerous brutal assaults, obviously racially animated, on unwary citizens. Vigorous and forceful police action was absolutely necessary to control the violence and to restore calm. To accomplish

this, many policemen willingly and courageously exposed themselves to personal danger in line of duty and several were wounded, one fatally. Without them, the City of York would have become a gory death chamber during this terrifying period. As sometimes happens in cases of riotous magnitude, there were some excesses, but they were not descriptive of police behavior generally when the entire panorama of events is considered. But, it must not be overlooked that I am being asked to conclude that the York Police Force systematically denied fair and humane treatment to York citizens and that this alleged improper conduct was the result of the named defendants' failure to impose the necessary controls.[14] This I refuse to do as it is unwarranted under the evidence in the record.

Only a few of the 94 members of the Police Department figured in the testimony and the only reference to objectionable conduct by the named defendants was one racial statement attributed to Captain Koontz. Plaintiffs' counsel, in fact, referred to defendant Leonard Landis, York's Police Chief, as "a fair man". I do not, however, condone the instances testified to in these proceedings of racism, antagonism, name-calling and physical abuse, but merely hold that the evidence does not establish the existence of a pattern of such conduct or that such attitudes are officially espoused or tolerated. These incidents were considered solely in the context of the relief sought here and are not intended to be totally dispositive of the many charges of illegal activity and improper policy. Further official investigation may well be warranted and corrective action taken. As in all law-enforcement activities in these days of social unrest, self-analysis and introspection are necessary so that past errors can be corrected, incompetent and uncooperative personnel eliminated, and service improved generally. A new atmosphere of trust and confidence between the York Police and the black community would be most welcome and would go a long way to

14. See Schnell v. City of Chicago, 407 F.2d 1084 (7th Cir. 1969).

avoid any future senseless blood baths. The adoption of regulations relative to police activity is a heartening sign and is a step in the right direction.

After a careful review of all the evidence, I conclude that plaintiffs are not entitled to injunctive relief.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the parties and the subject matter.

2. Plaintiffs are not entitled to injunctive relief.

3. Plaintiffs' complaint is dismissed.